UNITED STATES, Appellant and
Cross-Appellee,

v.

Stephen H. LEWIS, Specialist Four,
United States Army, Appellee and
Cross-Appellant.

No. 38,521.
CM 437540.

U. S. Court of Military Appeals.

June 15, 1981.

Appellant and Cross-Appellee: *Captain John P. Galligan* (argued); *Colonel R. R. Boller, Major Ted B. Borek, Major Robert B. Williams, Captain Lawrence W. Fitting* (on brief).

Appellee and Cross-Appellant: *Major Charles A. Byler* (argued); *Lieutenant Colonel John F. Lymburner, Captain Julius Rothlein* (on brief).

*Opinion of the Court*

EVERETT, Chief Judge:

Specialist Four Lewis was tried on June 20, July 25, and August 1, 1978, by a general court-martial, judge alone, at Wurzburg and Schweinfurt, Germany. After pleading not guilty to the charges, he was convicted of wrongful possession of .02 grams of heroin, in violation of Article 134 of the Uniform Code of Military Justice, 10 U.S.C. § 934. The judge sentenced him to a bad-conduct discharge, two months' confinement and reduction to Private E–1. This sentence was subsequently approved by the convening authority. However, the United States Army Court of Military Review set aside the conviction because it thought this was required by reason of our decision in *United States v. Porter*, 7 M.J. 32 (C.M.A. 1979), where we had observed, according to the Court below,

> that chain of custody forms of the type utilized in this case are prepared "principally with a view to prosecution" in the sense of paragraph 144d, Manual for Courts-Martial, United States, 1969 (Revised edition) and that, under paragraph 139a of the Manual, such documents constitute incompetent and inadmissible hearsay.

*United States v. Lewis*, 8 M.J. 754, 756 (A.C.M.R.1979). Furthermore, the Court below noted that in our decision in *United States v. Neutze*, 7 M.J. 30 (C.M.A.1979), "this same rule was determined to be applicable even in the absence of defense objection." *Id.* at 756 n.2.

Pursuant to Article 67(b)(2) of the Code, 10 U.S.C. § 867(b)(2), the Judge Advocate General of the Army filed with us a certified question, asking whether our *Porter* and *Neutze* decisions "should be applied retroactively," since this case had been tried even before those decisions had been decided.[1] 8 M.J. 241 (C.M.A.1980). Subsequently, Lewis himself filed a petition for review with the Court;[2] and we then granted review (9 M.J. 147) of his claim that the seized heroin should have been suppressed as evidence, since it constituted the "fruits of a poisonous tree."

---

1. As we have already indicated, Lewis was tried on June 20, July 25 and August 1, 1978; *Porter* and *Neutze* were decided on May 7, 1979. However, the Court of Military Review "retroactively" applied our *Porter* decision to April 3, 1978, the date of our decision in *United States v. Nault*, 4 M.J. 318, where the rule in *Porter* had first been stated. The court below had perceived that thereafter we were summarily disposing of cases, *e. g., United States v. Guinn*, 7 M.J. 475 (C.M.A.1979) (mem.); *United States v. Bagby*, 7 M.J. 476 (C.M.A.1979) (mem.); *United States v. Tresvant*, 7 M.J. 476 (C.M.A.1979) (mem.); *United States v. McKinney*, 7 M.J. 477 (C.M.A.1979) (mem.), where "it appears [*Nault*] was accorded full precedential effect"; *but see United States v. Stuckey*, 8 M.J. 132 (C.M.A.1979). *United States v. Lewis*, 8 M.J. 754, 756 (A.C.M.R.1979).

2. Hereinafter we shall refer to Specialist Four Lewis as the appellant, even though in this appeal he is technically the "cross-appellant" and the "appellee."

## I

We shall first address the appellant's claim because, if his claim is meritorious—that is, if the heroin was indeed tainted evidence—all questions pertaining to the chain of custody over the heroin would be rendered moot.

Sergeant Chestnut was in charge of the Reactionary Force stationed at Camp Lee in Wallbach, Germany, which is located near the East German border. The appellant and Specialist Stuckey were members of this unit, which was charged with border protection responsibilities. Sergeant Chestnut went to look for Specialist Stuckey in his assigned room in the barracks in order to give him his duty assignment and to tell Stuckey that he must inform the sergeant of his whereabouts at all times. Stuckey was not in his room, but Sergeant Chestnut was told that he was in another room down the hall. When he knocked there on the door, no one answered; he knocked again, but there was still no answer. When he finally attempted to open the door, Chestnut found that the door had been locked. He was aware that this violated the battery policy; "[t]he doors are not supposed to be locked, because" there were no room keys. Moreover, Sergeant Chestnut "knew that there were people in there because [he] could hear them talking."

Since Sergeant Chestnut's suspicion had been aroused by these voices, and since he "wanted to see if [Stuckey] was inside," he proceeded outside to the window of the room where he had heard the talking. Even though there were drapes at the window, he could see into some parts of the room since the drapes did not fully cover the window; and he discerned that several individuals were packaging a white powdery substance. He then left the window to report what he had seen. Eventually the battery commander, two lieutenants, and two ranking sergeants returned to the window with Sergeant Chestnut to observe the suspected criminal activity which was in progress.

The battery commander concluded that the men inside the room were trafficking in drugs; and so they proceeded to the front door of the room. After repeated knocks on the door and demands for entry, the door was finally opened. A variety of items used in packaging the white powdery substance lay about the room in plain view. Thereupon, the six occupants of the room were apprehended, sequestered in a corner, and kept under surveillance until the military police came. Among the six soldiers were the appellant and Specialist Stuckey.

When MP Sergeant VanBuskirk arrived, he had the six men moved into the hallway. A search of the room followed in which several packets of white powder and other drug paraphernalia were seized as evidence. Meanwhile, in the hallway Sergeant Chestnut had observed the appellant attempting to discard a packet by tossing it towards a trash container, but Sergeant VanBuskirk recovered it. Appellant's conviction was based upon this heroin which he had attempted to discard in the hallway.[3]

At his court-martial, the appellant's defense counsel unsuccessfully objected to admission of the seized heroin on the grounds that Sergeant Chestnut's peeping into the room's window constituted an illegal search and violated the appellant's expectation of privacy. The same contention is advanced here by appellate defense counsel, who assert that, "since this search was conducted without the benefit of a *search warrant*, and it does not fall within any recognized exception to the Fourth Amendment's requirement, for a *search warrant*, appellant's claim that his Constitutional right of privacy was violated by Sergeant Chestnut's

---

**3.** Even though the appellant was tried for conspiracy to sell .14 grams of heroin and possession of .14 grams of heroin—among other charges—he was acquitted of the former offense and was only convicted of possessing .02 grams of heroin. Thus, we are only concerned with the heroin which the appellant had attempted to discard and which Sergeant VanBuskirk recovered in the hallway. Prosecution exhibits 3 and 6 reflect that this was the exact amount of heroin that was recovered in the hallway. The lower court, too, only considered the heroin packet found in the hallway. *United States v. Lewis, supra.*

peeking becomes meritorious." [4] (Emphasis added).

At the outset a question might be raised as to whether, having discarded the packet, Lewis still is entitled to protest its admission in evidence. However, we shall assume for present purposes that the causal relation between the entry into the room and his abandonment of the packet was sufficient to authorize his objection. Even on that premise we must disagree with appellant's contention.

■ Admittedly the sergeant's peering through the window might be characterized as a "search" under some of the more extensive interpretations of the Fourth Amendment. However, if the sergeant was "searching," the "search" was for a person—not for evidence of a crime—and under the circumstances was reasonable. To comply with the express provisions of the Fourth Amendment, a warrant must "particularly describ[e] the place to be searched, and the persons or things to be seized." However, Sergeant Chestnut had no intent to "seize" any person or property; instead his concern was simply to locate Specialist Stuckey in order to inform him of his duty assignment. This clearly is not the situation contemplated by the warrant clause of the Fourth Amendment.

■ When we measure the sergeant's conduct against the fundamental Fourth Amendment standard of reasonableness, cf. *United States v. Stuckey*, 10 M.J. 347 (C.M. A.1981), we can only conclude that in the military environment a service member who has the responsibility of locating another person to advise him of a military duty which he must perform is entitled to use reasonable means to locate that person; and it is not unreasonable to look in through a window after there has been no reply to a knock on the door but still voices are heard within a room. Any other conclusion would hinder military operations by erecting an undue barrier to efforts of officers and non-commissioned officers to locate their subordinates.

■ Nothing in the record demonstrates that the area around the barracks was not available for general access or that Sergeant Chestnut was peeking into the room from a location where he generally would not be allowed to be present. Under these circumstances the occupants of the room had no reasonable expectation of privacy with respect to passersby—whether casual or official—who looked into the room through an opening available in the window.

■ Appellant's reasonable expectations of privacy would be further reduced by the existence of the battery policy that rooms in the barracks be left unlocked. In light of that policy, he could reasonably anticipate that, if the door of his room were locked, then his superiors would not acquiesce in his effort to create a private enclave, but instead would use any feasible means to obtain access to his room. In short, he was on notice that he would not be allowed to create a private sanctuary where he would be shielded from control by his military superiors.

Our attention has been called to a great number of federal cases which the appellant has cited in support of his claim. He particularly cites as dispositive in his favor the cases of *McDonald v. United States*, 335 U.S. 451, 69 S.Ct. 191, 93 L.Ed. 153 (1948); *California v. Hurst*, 325 F.2d 891 (9th Cir. 1963), *rev'd on other grounds*, 381 U.S. 760, 85 S.Ct. 1796, 14 L.Ed.2d 713 (1965); and *Brock v. United States*, 223 F.2d 681 (5th Cir. 1955). However, those precedents are readily distinguished from the case at hand. There the police were searching for criminal activity or evidence of crime. Also, when looking through a window into an enclosed area, they were not positioned in a location to which the general public had ready access.

Accordingly, we reject the appellant's contention that Sergeant Chestnut violated his Fourth Amendment right when he looked through his window. Thus, the seizure of heroin in the hallway was not a "fruit of the poisonous tree," which should be suppressed as evidence.

---

4. Final brief, p. 11.

## II

In regard to the certified question, there is no occasion here to determine whether our previous decisions in *United States v. Porter, supra,* and *United States v. Neutze, supra,* are to be applied retroactively. Even if these decisions were fully applied to the case at hand, the heroin was still admissible as evidence, for it had been sufficiently identified at trial as the heroin originally possessed by the appellant.[5] *See United States v. Clay,* 10 M.J. 269 (C.M.A. 1981); *United States v. McAnally,* 10 M.J. 270 (C.M.A.1981); *cf. United States v. Steck,* 10 M.J. 412 (C.M.A.1981). Indeed, as the Court has recently explained, "[i]f the items were readily identifiable, this could be accomplished by direct evidence from an identifying witness at trial."[6] *United States v. Parker,* 10 M.J. 415, 416 (C.M.A. 1981); *United States v. Fowler,* 9 M.J. 149, 152 (C.M.A.1980).

In the case at hand, Sergeant VanBuskirk and Staff Sergeant Kolle convincingly identified the white paper packet containing a powdery substance as that which the appellant had attempted to dispose of in the hallway. VanBuskirk testified that he had "recovered [this] white packet underneath the trash container" in the hallway which "also contained a white powdery substance." Upon retrieving this item, he marked the packet with his initials, the time, and the date. "Approximately an hour to an hour and a half later," he returned to the military police station at Bad Kissingen and placed the packet in a larger plastic bag. He similarly marked the plastic bag with his initials, the time and the date; and this was done with a Green Magic Marker. He then stapled an "evidence property tag" (DA Form 4002) to the plastic bag; and also initiated an "Evidence/Property Custody Document" (DA Form 4137), on which his "initials [were] fixed [sic] as receiving property and releasing it to the desk sergeant." When he had released this evidence to the desk sergeant (a Sergeant Minster), he "physically watch[ed] him put it into the safe." Prior thereto Sergeant VanBuskirk—according to his testimony— had exclusive possession of the heroin packet, and nobody had tampered with or even opened the packet in his presence. At most, Sergeant VanBuskirk's handling of the packet did not extend over two hours.

At trial, Sergeant VanBuskirk agreed, that "with absolute certainty" he could identify prosecution exhibit 7 as the same items discarded by the appellant at the crime scene, since "[b]oth the packet and the plastic bag ... contained, date, time, and my initials," placed there with the Green Magic Marker. Moreover, the items were identifiable as the ones VanBuskirk recovered from the appellant since in his German "experience they're unique"—that is, while in Germany, he otherwise "never had occasion to recover items similarly packaged such as those [he] recovered." Of course, the laboratory report (prosecution exhibit 6) concluded that the white powdery substance contained in the packet was heroin.

---

5. Our recent decisions in *United States v. Parker,* 10 M.J. 415 (C.M.A.1981); *United States v. Courts,* 9 M.J. 285 (C.M.A.1980); *United States v. Fowler,* 9 M.J. 149 (C.M.A.1980), have discussed problems dealing with the chain of custody and have amplified our earlier chain of custody cases. Given those explications, the current effect of these decisions on the administration of military justice seems minimal.

6. *Cf. United States v. Nault,* 4 M.J. 318, 319–20 (C.M.A.1978):

> The in-court identification of ... fungible items by a competent witness is generally not permitted where the item is neither readily identifiable, marked distinctively, nor possessed of individuated characteristics....

> Generally fungible evidence becomes admissible and material through a showing of continuous custody which preserves the evidence in an unaltered state. [citations] This may be shown by having the testimony of the handlers of the fungible goods produced in court.

Of course, as we stated *United States v. Fowler, supra* at 152:

> We in no way intend to diminish the concern we displayed in *Nault* as to the chain of custody for fungible evidence; the trial court must be assured that such evidence has been properly handled and accounted for and has not been tampered with in any way.

Moreover, Staff Sergeant Kolle, the assistant operations sergeant and evidence custodian, testified that on April 13, 1978—only one day after Sergeant VanBuskirk had delivered the packet of heroin to Sergeant Minster—he "initially receipted for the evidence" and "deposited them in the evidence depository for security." At the request of the Bad Kissingen Military Police Investigation Section, he then forwarded the evidence by registered mail to the crime laboratory in Frankfurt. This had been done on April 18, 1979; and ten days later the evidence was returned to him by registered mail.

At trial, Staff Sergeant Kolle also agreed that prosecution exhibit 7—the packet bag containing the heroin—was "readily identifiable." These were the same items of which he had received on April 13, 1978, and which he had sent to the laboratory to be analyzed. They could be identified by the "initial markings" placed on them by Sergeant VanBuskirk; "[t]he most significant markings [were] ... on the piece of white paper inside of the bag," which VanBuskirk had marked with his initials, the time and the date. Kolle recognized the document number 253–78 which he had placed on the evidence tag (DA Form 4002) that had been attached to the larger plastic bag containing the packet of heroin. Moreover, he testified that he recognized "the 'BKS' Bad Kissingen entry case number, 209–78," which he had also placed on the evidence tag. Indeed, when Staff Sergeant Kolle's testimony is considered along with Sergeant VanBuskirk's, prosecution exhibit 7 had been identified "with absolute certainty" by the particular packaging and immediate labeling as the heroin packet which the appellant had thrown away.

In both *United States v. Porter, supra,* and *United States v. Neutze, supra,* no witnesses attempted to identify the contraband as the substance that the accused had possessed. Furthermore, the contraband apparently was completely fungible and unmarked, which made impossible any identi-

fication of it. *See United States v. Parker, supra; United States v. Fowler, supra* at 152; *United States v. Nault,* 4 M.J. 318, 319 (C.M.A.1978). Only a DA Form 4137 which purportedly established a continuous chain of custody over fungible contraband provided the foundation for admission in evidence. Clearly, the facts here are totally dissimilar; and so these cases do not apply.

Even the absence of testimony from some of the handlers in the chain of custody in the case at hand does not make the "readily identifiable" heroin packet any less identifiable. While sometimes there may be disagreement as to whether a container is "readily identifiable" or whether the "possibility of tampering" has been adequately excluded, cf. *United States v. Courts,* 9 M.J. 285 (C.M.A.1980), this Court has never disputed the proposition that, if a fungible substance is contained in a "readily identifiable" package and the trial court is satisfied that the contents of that package have not been altered in any significant way, then the package and contents may be received in evidence.

In the case at hand, there was no evidence that the seized package marked by Sergeant VanBuskirk had not been retained securely by the evidence custodian or the assistant evidence custodian. Accordingly, the military judge could have reasonably concluded that the evidence had not been tampered with. We therefore find no error on the judge's part in admitting prosecution exhibit 7, since even apart from the chain of custody document (prosecution exhibit 5), the heroin packet had been adequately identified.

IV

The decision of the United States Army Court of Military Review is reversed and the appellant's conviction for possession of .02 grams of heroin is affirmed. The record of trial is returned to the Judge Advocate General of the Army for submission to the Court of Military Review for

further proceedings regarding the sentence, pursuant to Article 66(c), UCMJ, 10 U.S.C. § 866(c).

COOK, J., concurs.

FLETCHER, Judge (concurring in the result):

I find the doctrine of "plain view" fatally undermines the appellant's fourth amendment claim in this case. *Harris v. United States*, 390 U.S. 234, 88 S.Ct. 992, 19 L.Ed.2d 1067 (1968).

Turning to the second part of the majority opinion, I agree that our decisions in *United States v. McAnally*, 10 M.J. 270 (C.M.A.1981), and *United States v. Clay*, 10 M.J. 269 (C.M.A.1981), make it unnecessary to answer the certified question. *See United States v. Parker*, 10 M.J. 415 (C.M.A. 1981), and *United States v. Fowler*, 9 M.J. 149 (C.M.A.1980).