UNITED STATES, Appellant,

v.

Thomas M. WISNIEWSKI, Lance Corporal, U.S. Marine Corps, Appellee.

No. 51556.

NMCM 84 2363.

U.S. Court of Military Appeals.

March 3, 1986.

For United States: *Lieutenant Commander John B. Holt, JAGC, USN* (argued); *Captain W.J. Hughes, JAGC, USN* (on brief).

For the accused: *Lieutenant John B. Consevage, JAGC, USNR* (argued); *Lieutenant Colonel M.W. Lucas, USMC* (on brief); *Lieutenant Commander Alvin L. McDonald.*

*Opinion of the Court*

COX, Judge:

Contrary to his pleas at a general court-martial, the accused was convicted* by military judge sitting alone of distribution of lysergic acid diethylamide (LSD), in violation of Article 134, Uniform Code of Military Justice, 10 U.S.C. § 934. He was sentenced to confinement at hard labor for 9 months, forfeiture of all pay and allowances, reduction to pay grade E-1, and a bad-conduct discharge. The convening authority approved the sentence except for disapproving confinement in excess of 6 months and 17 days. The Court of Military Review set aside the findings and sentence after concluding that the military judge erred in denying a motion to suppress evidence as the fruits of an unlawful search and seizure. 19 M.J. 811. Whereupon, the Judge Advocate General of the Navy certified the following two issues for review by this Court:

I

WHETHER THE U. S. NAVY–MARINE CORPS COURT OF MILITARY REVIEW ERRED WHEN IT FOUND THAT THE ACCUSED'S EXPECTATION OF PRIVACY IN THE BARRACKS ROOM AND WALL LOCKER ASSIGNED TO ANOTHER WAS REASONABLE WHEN THE ACCUSED AND TWO OTHERS, NONE OF WHOM WERE ASSIGNED THE BARRACKS ROOM, ENTERED THAT UNOCCUPIED BARRACKS ROOM SOLELY FOR THE PURPOSE OF DISTRIBUTING LSD.

II

WHETHER THE U.S. NAVY–MARINE CORPS COURT OF MILITARY REVIEW ERRED WHEN IT FOUND A SERGEANT'S SEARCH TO BE UNLAWFUL WHEN, WITH PROBABLE CAUSE TO BELIEVE THAT DRUGS WERE BEING DISTRIBUTED BY THE ACCUSED IN A BARRACKS ROOM, THE SERGEANT PEERED THROUGH THE WINDOW, SAW DRUGS BEING DISTRIBUTED, ENTERED THE ROOM, AND OBTAINED DRUGS FROM THE ACCUSED.

We answer the certified questions in the affirmative.

The facts giving rise to the suppression issue are essentially undisputed. At approximately 1300 hours, on December 16, 1983, Corporal Seipp was delivering the platoon mail in the barracks. While in the room of Sergeant Keane, he expressed his suspicions that another member of the platoon, Lance Corporal Lansing, was distributing drugs from his barracks room down the hall.

Sergeant Keane had been off duty since 0730 hours that morning. After the conversation with Corporal Seipp, Sergeant Keane dressed in civilian clothes and went outside his room onto the walkway to get some fresh air, leaving his door open so he could hear the music from his stereo. Lansing's room was two doors down. The design of the barracks was similar to a motel, with each room having a large glass window next to a door leading outside to a walkway that ran the length of the barracks. The three-feet wide walkway was used not only to gain access to the rooms, but as a porch or balcony.

As Sergeant Keane lounged outside his room on the walkway for the next few hours, he noticed 20 to 30 people knocking on Lansing's door. They received no answer, however, as Lansing was on duty at the Guard Shack and his roommate was on

---

* The court below erroneously stated that the accused "was convicted ... of possession of a prohibited drug," as well. 19 M.J. 811, 812. The possession specification was dismissed as multiplicious prior to findings. (R.118.) GCMO No. 7–84, dated 13 June 1984, fails to reflect this action at trial.

emergency leave. At around 1630 hours, two persons from another platoon, known to Sergeant Keane as Lance Corporal Turner and Hospitalman Irish, knocked on Lansing's door. Upon receiving no response, they went next door to the accused's room. After a brief conversation, the accused went with the two men to find Lansing, who was still on duty. Lansing gave the accused keys to his barracks room and wall locker and asked the accused to transfer illegal drugs contained in the locker to the two men as "a favor."

When the accused and the two potential drug purchasers entered Lansing's barracks room, Sergeant Keane was still standing outside on the balcony. As the door closed behind the trio, it locked automatically. The venetian blind over the window was already shut. Sergeant Keane walked over to the window and peered into an opening in the blinds measuring approximately 1/8-inch by 3/8-inch.

He saw the accused open a wall locker and transfer a white substance to the two men, who then consumed some of the substance. Corporal Seipp and Lance Corporal Day came by while Sergeant Keane was peering in the window. They too looked through the hole in the blind, observing the figures in the room. Believing that he was witnessing a drug transaction in progress, Sergeant Keane sent Corporal Seipp to get the Officer of the Day. On the way, Corporal Seipp ran into the platoon sergeant, Staff Sergeant Lonard, and told him the situation. Lonard immediately went to the scene and Keane related his observations.

Both sergeants went to the door of Lansing's room. As Keane knocked on the door, he looked into the room through a two-inch space between the window and the door. He observed the accused close and lock the wall locker. The drug purchasers opened the door and attempted to exit the room, but were stopped. Sergeant Lonard ordered all three men to remain inside the room until the Officer of the Day arrived.

The accused then asked Keane what the problem was. Keane, who was a "very close" friend of the accused, responded that he "had witnessed ... [the accused] in a drug transaction" and that the accused should "surrender the drugs" "for his own benefit." The accused responded by banging his head against a wall locker and uttering an expletive. Staff Sergeant Lonard then said, "Ski, give up the drugs." The accused pulled the locker key out of his pocket, opened the wall locker, and handed to Keane what was later determined to be 90 tabs of LSD.

The court below concluded that when Sergeant Keane peered in the window of Lansing's barracks room, he conducted an unlawful visual search. Assuming without deciding that the court below correctly found that Sergeant Keane was acting throughout in an official rather than private capacity, we still disagree with that court's ultimate legal conclusion.

██ It is clear "that a person can have a legally sufficient interest in a place other than his own home so that the Fourth Amendment protects him from unreasonable governmental intrusion into that place." *Rakas v. Illinois,* 439 U.S. 128, 142, 99 S.Ct. 421, 430, 58 L.Ed.2d 387 (1978). The ultimate issue in determining whether a Fourth-Amendment violation has occurred is whether there has been an official invasion of a legitimate expectation of privacy. Here, we conclude there was no reasonable expectation of privacy invaded by the actions of Sergeant Keane as he did nothing more than look through an opening available to any curious passerby. *Cf. United States v. Amuny,* 767 F.2d 1113 (5th Cir.1985). Plain-view observations by an officer properly in a position to have such a view do not constitute unreasonable searches under the Fourth Amendment. *See Texas v. Brown,* 460 U.S. 730, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983); *United States v. Wheeler,* 641 F.2d 1321 (9th Cir.1981). Moreover, contraband or other evidence of a crime falling into plain view are subject to seizure. *Washington v. Chrisman,* 455 U.S. 1, 5–6, 102 S.Ct. 812, 816, 70 L.Ed.2d 778 (1982); Mil.R.Evid. 316(d)(4)(C), Manual for Courts-Martial, United States, 1969 (Revised edition).

■ Although not cited by the court below, in *United States v. Lewis*, 11 M.J. 188 (C.M.A. 1981), this Court was faced with another situation where a sergeant peered through the window of a barracks room. Writing for the majority of the Court, Chief Judge Everett stated, in part:

> Nothing in the record demonstrates that the area around the barracks was not available for general access or that Sergeant [C] was peeking into the room from a location where he generally would not be allowed to be present. Under these circumstances the occupants of the room had no reasonable expectation of privacy with respect to passersby—whether casual or official—who looked into the room through an opening available in the window.

*Id.* at 191. The same can be said of this case. The common walkway from which Sergeant Keane peered through the opening in the blinds was available for the use of residents of the barracks and their guests, as well as others having legitimate reasons to be on the premises. Sergeant Keane was lawfully in the place from which his observations were made. He had no difficulty in gaining a view into the room by merely peering through the openings in the blinds. Thus, the accused had no reasonable expectation of privacy from visual intrusions in the place and objects observed because they could be viewed with ease from a public walkway.

■ On observing what he believed to be not only the distribution of drugs but also the ingestion of drugs, Sergeant Keane acted reasonably in gaining entry into the room to prevent further criminal activity. As stated in *United States v. Acosta*, 11 M.J. 307, 313 (C.M.A. 1981), "[W]e can conceive of no greater exigency requiring immediate action than the perceived present active use of debilitating drugs by specific servicepersons." When Sergeant Keane knocked on the door of the room, it was opened without any inquiry as to his identity or purpose.

■ Had the situation remained stable and the drugs been in plain view with the locker open upon his entry into the room, unquestionably Sergeant Keane would have been able to seize the drugs and apprehend the three men. As he was knocking on the door, however, Sergeant Keane observed the accused close and lock the locker. The question becomes whether the doctrine of plain view was fatally undermined by the fact that the drugs were no longer in sight. We hold that it was not under these facts. Sergeant Keane had just seen a crime in progress and the contraband in plain view. The entry into the room followed closely on the heels of the observations through the window. Once legitimately in the room, he could properly obtain the drugs already located via plain view just a few minutes before. *See United States v. Ortiz*, 603 F.2d 76 (9th Cir. 1979), *cert. denied*, 444 U.S. 1020, 100 S.Ct. 678, 62 L.Ed.2d 652 (1980); *United States v. Johnson*, 561 F.2d 832 (D.C. Cir.) (*en banc*), *cert. denied*, 432 U.S. 907, 97 S.Ct. 2953, 53 L.Ed.2d 1080 (1977).

The decision of the United States Navy-Marine Corps Court of Military Review is reversed; the record of trial is returned to the Judge Advocate General of the Navy for remand to that court for further proceedings in accordance with Article 66, UCMJ, 10 U.S.C. § 866.

Chief Judge EVERETT concurs.