UNITED STATES, Appellee,

v.

Donald J. KALISKI, Second Lieutenant
U.S. Air Force, Appellant.

No. 93–0069.
CMR No. 29086.

U.S. Court of Military Appeals.

Argued April 13, 1993.

Decided June 1, 1993.

For Appellant: *Captain Robert A. Parks* (argued); *Colonel Terry J. Woodhouse* and *Lieutenant Colonel Francis T. Lacey,* USAFR (on brief).

For Appellee: *Captain Thomas E. Wand* (argued); *Lieutenant Colonel Jeffery T. Infelise* (on brief); *Colonel Richard L. Purdon.*

*Opinion of the Court*
GIERKE, Judge:

A military judge sitting as a general court-martial convicted appellant, contrary to his pleas, of conduct unbecoming an officer by committing acts of adultery and sodomy with the wife of a staff sergeant, in violation of Article 133, Uniform Code of Military Justice, 10 USC § 933. The military judge sentenced appellant to a dismissal, forfeiture of $500.00 pay per month for 2 months, and a reprimand. The convening authority approved the dismissal and the forfeitures, but not the reprimand. The Court of Military Review affirmed the findings and sentence in an unpublished opinion dated August 24, 1992. This Court granted review of the following issue: *

> WHETHER THE AIR FORCE COURT OF MILITARY REVIEW ERRED WHEN THEY HELD THAT THE TESTIMONY OF MRS. S WAS NOT TAINTED BY THE ILLEGAL SEARCH OF THE SPI [SECURITY POLICE INVESTIGATORS], AND THUS INEVITABLY DISCOVERABLE.

Appellant was a public affairs officer at Vandenberg Air Force Base, California. Mrs. S was employed by a local newspaper and regularly conducted business at the base public affairs office. She was married to a staff sergeant assigned to the base hospital and the mother of two children, ages 11 and 8.

Appellant's co-worker and neighbor observed Mrs. S's car outside appellant's Bachelor Officer's Quarters (BOQ) on numerous occasions, suspected they were having an affair, and reported his suspicions to the security police on June 25, 1990. Appellant's BOQ was a duplex on Vandenberg Air Force Base, with a private entrance at the front and a sliding glass door leading to a private patio at the rear.

On Friday evening, June 29, 1990, appellant's neighbor called the security police to advise them that Mrs. S's car was once again parked outside appellant's BOQ. At about 10:15 p.m., two investigators, Staff Sergeants Hagans and Pennywitt, rode by appellant's quarters on bicycles while investigating an unrelated complaint of animal mutilation. They noticed Mrs. S's car parked in front of the BOQ, but the curtains were drawn and the interior appeared to be dark. When they rode by again at about 11:00 p.m., the scene was unchanged. They returned shortly before midnight and

---

* We heard oral argument in this case at the United States Air Force Academy, Colorado Springs, Colorado, on Tuesday, April 13, 1993, as part of "Project Outreach." *See United States v. Stinson,* 34 MJ 233, 234 n.* (CMA 1992).

rode their bicycles into an open field behind appellant's BOQ. From a distance of about 60 feet they noticed a light and movement inside appellant's BOQ. Sergeant Pennywitt went to the front of the BOQ, determined that Mrs. S's car was still parked in front, and verified that they were looking into appellant's BOQ. Sergeant Pennywitt returned to the rear of the building. He and Hagans then advanced onto the patio, within three feet of the patio door, and peeked through an 8–to 10–inch gap in the curtains. They watched appellant and Mrs. S for about 35 minutes, during which they witnessed appellant and Mrs. S engaging in oral sodomy. Shortly after midnight, they saw Mrs. S looking directly at them. Thinking they had been seen peering through the curtains, they ran from the area, leaving their bicycles behind.

Sergeants Hagans and Pennywitt had been told "to handle the situation with a great deal of professionalism" because it involved an officer. They ran from the scene because they "didn't feel that [they] should go ahead and cause an embarrassing moment between an officer and an enlisted person's wife."

On the following Monday morning, the security police called Mrs. S to the police station and interviewed her. Sergeant Pennywitt testified that he told Mrs. S that they "were investigating an allegation with Lieutenant Kaliski and herself." He testified that he did not tell her that he had personally "observed the activity," but he told her that he and Sergeant Hagans "knew some things and that we wanted to interview her to confirm or deny it."

Sergeant Pennywitt testified that Mrs. S asked if they had observed her activity with appellant. Sergeant Pennywitt testified that he was "not real positive" whether he told Mrs. S what they had observed before or after her statement was written, but he "believe[d] it was after the statement was written."

Mrs. S testified that on the night of June 29–30, while with appellant in his BOQ, she observed someone looking into the BOQ from the patio. Regarding her interview by Sergeants Hagans and Pennywitt, Mrs. S testified as follows:

Q. Now after you observed the face in the window, when did you next become aware of the fact that somebody had observed your activities that evening?

A. Only once.

Q. Were you later called in and questioned by security police officers concerning the incident that evening?

A. Yes, I was.

Q. Did they tell you that they had observed the activities that were going on in the premises?

A. After I was there. I mean they didn't tell me until I got there.

A. But when you did get there they told you they had observed what was going on that evening on the 29th of June?

A. Yes.

Q. And did they describe in detail what they had observed?

A. Pretty much in detail.

Q. As a result of the fact that they called you and confronted you with this, did you give a statement to the police officers?

A. Yes, they had told me about the details after I gave them my statement.

At trial appellant moved to suppress all evidence obtained from the surveillance of his BOQ and any evidence derived from the observations of the security police, including Mrs. S's testimony. The military judge found that "Sergeants Hagans and Pennywitt were not trespassing at the time they made their observations," and that the activities of appellant and Mrs. S "were in plain view." CMR unpub. op. at 4. He ruled that Sergeants Hagans and Pennywitt did not violate appellant's Fourth Amendment rights by peering through his patio window. *Id.* at 5. The Court of Military Review disagreed, holding that Sergeants Hagans and Pennywitt had engaged in an unlawful search of appellant's BOQ, *id.* at 6–7, but holding further that Mrs. S's statement and subsequent testimony would have been inevitably discovered. *Id.* at 8–9. We agree with the Court of

Military Review that Sergeants Hagans and Pennywitt conducted an unlawful search of appellant's BOQ, but we disagree with the Court of Military Review on the question of inevitable discovery. Accordingly, we reverse the decision of that court.

### The Surveillance

■ The Fourth Amendment protects citizens from unreasonable governmental intrusion into their homes. *Silverman v. United States*, 365 U.S. 505, 511, 81 S.Ct. 679, 682, 5 L.Ed.2d 734 (1961). A tenant has the same protection as an owner. *Chapman v. United States*, 365 U.S. 610, 81 S.Ct. 776, 5 L.Ed.2d 828 (1961). Military law recognizes a privacy right in government quarters. *See United States v. Figueroa*, 35 MJ 54 (CMA 1992) (probable-cause analysis for search inside government quarters); *United States v. Thatcher*, 28 MJ 20 (CMA 1989) (recognizing expectation of privacy in barracks room). *Cf.* RCM 302(e)(2), Manual for Courts–Martial, United States, 1984 (authorization required to make apprehension in private government quarters). The Fourth Amendment protects not only the interior of a home, but also the land "immediately adjacent" to the dwelling. *United States v. Anderson*, 552 F.2d 1296, 1300 (8th Cir.1977); *Texas v. Gonzales*, 388 F.2d 145, 147–48 (5th Cir. 1968); *Fixel v. Wainwright*, 492 F.2d 480, 483 (5th Cir.1974). *See United States v. Dunn*, 480 U.S. 294, 301, 107 S.Ct. 1134, 1139, 94 L.Ed.2d 326 (1987) (discussing factors determining the extent of a home's curtilage).

■ Looking into the window of a private residence is a search. *See McDonald v. United States*, 335 U.S. 451, 69 S.Ct. 191, 93 L.Ed. 153 (1948) (looking through transom of door in rooming house); *Texas v. Gonzales, supra* (looking into window); *Brock v. United States*, 223 F.2d 681 (5th Cir.1955) (looking into bedroom window). Where, as in this case, such a visual search occurs, the question is whether the search was reasonable. A plain view observation does not constitute an unreasonable search if made from a place where the observer

has a right to be. *United States v. Wisniewski*, 21 MJ 370, 372(CMA), *cert. denied*, 476 U.S. 1160, 106 S.Ct. 2281, 90 L.Ed.2d 723 (1986). *See United States v. Wheeler*, 641 F.2d 1321, 1324–26 nn. 7 and 9 (9th Cir.1981) (summarizing plain-view cases).

■ We agree with the Court of Military Review that Sergeants Hagans and Pennywitt had no right to be on appellant's patio, peeking through his patio door. They were not in a public area, but on a private patio on which appellant had a reasonable expectation of privacy. When Sergeants Hagans and Pennywitt peeked through the almost-closed curtain in the middle of the night and observed his sexual activities with Mrs. S, they had no search authorization or other justification for their visual search of appellant's quarters. Accordingly, we agree with the Court of Military Review that Sergeants Hagans and Pennywitt conducted an unlawful search of appellant's quarters.

### Inevitable Discovery

■ We part company with the Court of Military Review, however, on the issue of inevitable discovery. The exclusionary rule generally bars admission of live-witness testimony obtained through exploitation of police illegality. *Wong Sun v. United States*, 371 U.S. 471, 485, 83 S.Ct. 407, 416, 9 L.Ed.2d 441 (1963); *United States v. Terzado–Madruga*, 897 F.2d 1099, 1113 (11th Cir.1990). Nevertheless, live-witness testimony obtained through exploitation of police illegality may be admitted if the link to underlying illegality is sufficiently attenuated; if it is "derived from a source independent of" police illegality; or if it "would inevitably have been discovered absent" police illegality. *Hamilton v. Nix*, 781 F.2d 619, 624–25 (8th Cir.1985), *cert. denied*, 483 U.S. 1023, 107 S.Ct. 3270, 97 L.Ed.2d 768 (1987). *See* Mil.R.Evid. 311(b)(2), Manual, *supra* (illegally obtained evidence "may be used when the evidence would have been obtained even if such unlawful search or seizure had not been made"); *United States v. Kozak*, 12 MJ

389, 394 (CMA 1982) (adopted inevitable discovery rule).

 After an accused challenges the illegality of a search which led to a witness' testimony, the prosecution has the burden of showing, "by a preponderance of the evidence," that there is "(1) a reasonable probability that the contested evidence would have been discovered by lawful means in the absence of the police misconduct and (2) that the government was actively pursuing a 'substantial alternate line of investigation at the time of the constitutional violation.'" *United States v. Lamas*, 930 F.2d 1099, 1102 (5th Cir.1991). Each case must be decided on its specific facts. *See Brown v. Illinois*, 422 U.S. 590, 603, 95 S.Ct. 2254, 2261, 45 L.Ed.2d 416 (1975). Where live-witness testimony is involved, it is not enough to determine whether the witness would have been discovered independent of police illegality. Unlike real or documentary evidence, live-witness testimony is the product of "will, perception, memory and volition." *Smith v. United States*, 324 F.2d 879, 881–82 (D.C.Cir.1963), *cert. denied*, 377 U.S. 954, 84 S.Ct. 1632, 12 L.Ed.2d 498 (1964), cited with approval in *United States v. Ceccolini*, 435 U.S. 268, 277, 98 S.Ct. 1054, 1060, 55 L.Ed.2d 268 (1978). Accordingly, the degree of free will exercised by a witness is relevant in determining whether to apply the exclusionary rule to the witness' testimony. *United States v. Ceccolini*, 435 U.S. at 276, 98 S.Ct. at 1060. In order for the testimony to be admissible notwithstanding police illegality, the prosecution must establish that the witness' "independent act of free will" broke the chain of causation and caused the witness to testify. *United States v. Butner*, 15 MJ 139, 143–44 (CMA 1983).

 The issue of inevitable discovery was not litigated at the trial level in this case. Had it been, we would have reviewed the military judge's determination on an abuse-of-discretion standard. *United States v. Terzado–Madruga*, 897 F.2d at 1112. In this case the court below held that inevitable discovery was established

on the record. That court's holding is a legal conclusion which we review *de novo* to determine whether it is correct. S. Childress and M. Davis, *Federal Standards of Review* § 7.05 at 7–26 (2d ed.1992).

 We hold that the record in this case does not support the conclusion of the court below that there was a break in the chain of causation between the illegal search and Mrs. S's testimony. Although the security police had identified Mrs. S as a witness through a source independent of their surveillance of appellant's BOQ, it is unlikely from the record before us that they would have interviewed her in the absence of concrete evidence of misconduct, given their reluctance in this case to confront the parties with an embarrassing accusation without proof.

Even assuming, *arguendo*, that the security police would eventually have interviewed Mrs. S if appellant's neighbor continued to file complaints, there is no evidence of an "independent act of free will" on the part of Mrs. S. She did not voluntarily report appellant's misconduct. To the contrary, her unrebutted testimony was that she gave her statement "[a]s a result of the fact that they called [her] and confronted [her] with this." She was summoned to the police station on Monday morning, knowing that during the preceding weekend she had been observed *in flagrante delicto*. Sergeant Pennywitt told her that he "knew some things" about her and appellant and asked her to "confirm or deny" them. There was no significant passage of time between the illegal search and the interrogation of Mrs. S which could have attenuated the taint. There is no evidence that Mrs. S would have criminally implicated her paramour, further jeopardized her already troubled marriage, and embarrassed herself and her children, if she had not felt compelled to cooperate by the chain of events set in motion by government investigators which led to her interrogation. Once Mrs. S executed a sworn statement admitting her relationship and sexual activity with appellant, the cat was out of the bag. There is

no evidence that Mrs. S was independently motivated 4 months later to testify consistently with her statement to the security police. Accordingly, we hold that the Court of Military Review erred by holding that Mrs. S's testimony would have been inevitably discovered.

Virtually all the Government's direct evidence was derived from and tainted by the illegal search. Without the testimony of Mrs. S and the observations of Sergeants Hagans and Pennywitt, there is insufficient untainted evidence to support a conviction.

The decision of the United States Air Force Court of Military Review is reversed. The findings of guilty and the sentence are set aside. The charge and specification are dismissed.

Chief Judge SULLIVAN and Judge COX concur.

WISS, Judge (concurring):

I fully concur in the majority opinion. I write only to add that, apart from our agreement with the Court of Military Review that the search in question was unlawful, I consider that holding to be the law of the case in any event, absent a government challenge to it. *See United States v. Ravenel*, 26 MJ 344, 350 n.5 (CMA 1988); *see generally United States v. Lopez*, 35 MJ 35, 49 (CMA 1992)(Wiss, J., concurring in the result). Here, there has been no such challenge, even in the pleadings filed in this Court.

CRAWFORD, Judge (dissenting):

This case should be put in proper perspective. It is important not to let our judgment be clouded by the conduct of the security police investigators in this case. Appellant was convicted on October 19, 1990, of conduct unbecoming an officer by committing sodomy and adultery with Mrs. S on numerous occasions between May 4 and June 29, 1990. Appellant met Mrs. S in March 1990, and they started to socialize together. Beginning in the middle of March 1990, First Lieutenant Morey, who also worked in the Public Affairs Office,

observed Mrs. S's automobile parked outside appellant's BOQ (Bachelor Officers' Quarters) on several occasions during the evening hours.

Prior to June 25, 1990, Lieutenant Morey was concerned about appellant as an officer having an adulterous relationship with an enlisted person's spouse. He talked to a contemporary as to how he would confront this officer and how he would make the authorities aware of what was happening.

On June 25, 1990, First Lieutenant Morey complained to Staff Sergeant Hagans, a Security Police investigator (SPI), "that he suspected an adulterous affair" between appellant and Mrs. S because of his observations. CMR unpub. op. at 2. Based on this report, a formal investigation was opened. Lieutenant Morey reported that on more than 15 occasions prior to June 29, 1990, he had noticed Mrs. S's car at appellant's quarters from approximately 6:00 p.m. until after he retired for bed at 11:00 p.m. On June 16, 1990, the fire alarm went off around 1:30 a.m., and the occupants of the BOQs filed out onto the street. Appellant came out of his BOQ wearing a pair of gym shorts. At that time, Mrs. S's car was parked in front of appellant's BOQ, but Mrs. S did not appear on the street. Additionally, at trial Captain Hess, a lawyer on base, testified that, on one occasion in April, appellant brought Mrs. S to his (Hess') house as a date to watch movies. Captain Hess testified that based on "the close proximity of their bodies" as they sat together, he concluded appellant and Mrs. S probably had been dating.

At trial appellant moved to suppress evidence gathered during the June 29, 1990, search of appellant's BOQ. In denying the motion to suppress the judge found that the investigators had "articulable suspicions that an offense ... was being committed." Unpub. op. at 4.

Mrs. S testified that both her mother and grandfather had recently passed away and that she had talked to appellant about these deaths and their impact on her life. She said her conversations with appellant were a way for her to ventilate. She fur-

ther explained that their relationship then developed into an amorous affair. Mrs. S testified that from the beginning of April, they had oral sex twice a week and sometimes it would range from two to seven times per week. She testified that every time they got together from April through June, they engaged in sexual intercourse. To reinforce her testimony, Sergeant Hagans testified as to his observations on the night of June 29, 1990.

## DISCUSSION

The Fourth Amendment to the United States Constitution provides:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

The issue in this case can be divided into three parts:

I. Was there Fourth Amendment coverage?

II. Did exigent circumstances justify the intrusion?

III. Should the exclusionary rule be applied?

### I. Coverage

By its very terms, the Fourth Amendment protects persons, houses, papers, and effects. The term "houses" has been extended to include apartments. *Clinton v. Virginia*, 377 U.S. 158, 84 S.Ct. 1186, 12 L.Ed.2d 213 (1964). While the amendment does not extend to open fields, it does protect the "curtilage" around the house. *Oliver v. United States*, 466 U.S. 170, 180, 104 S.Ct. 1735, 1742, 80 L.Ed.2d 214 (1984). If the investigator's observations were from the curtilage and not a vantage point available to the curious passerby, there would

be a violation of appellant's Fourth Amendment rights.

The Supreme Court in *Oliver* defined curtilage "by reference to the factors that determine whether an individual reasonably may expect that an area immediately adjacent to the home will remain private." 466 U.S. at 180, 104 S.Ct. at 1742. Whether an area falls within the curtilage depends on four factors enunciated later by the Supreme Court in *United States v. Dunn*, 480 U.S. 294, 301, 107 S.Ct. 1134, 1139, 94 L.Ed.2d 326 (1987): "the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by." Applying these factors, the Court held that peering into the open front of a barn located 50 yards from the fence surrounding defendant's home was not unlawful. Another court applying these factors found:

The backyard of a house has repeatedly been held to be within the curtilage of a house and thereby protected from a warrantless search under the Fourth Amendment.... [Supreme Court] overflight cases implicitly hold, however, that a house's backyard is within the curtilage and is thereby protected from physical intrusion by police officers.

*United States v. Boger*, 755 F.Supp. 333, 338–39 (E.D.Wash.1990).

Here, the observations made by the investigators violated appellant's Fourth Amendment rights. They were not made from a vantage point available to the curious passerby. In fact, as indicated in the majority opinion, they did look at the patio windows from a distance and were unable to make the same observations.[1]

The judge's finding that there was no violation of appellant's reasonable expectation of privacy has a basis in our opinions. In *United States v. Alexander*, 34 MJ 121

---

**1.** The plain-view doctrine, which is better described as the open-view doctrine, does not violate the Fourth Amendment when the observations are made from an area over which appellant does not have a reasonable expectation of privacy.

(CMA 1992), this Court held: A commander could authorize a walk-through barracks inspection in common hallways with a detector dog; if the dog alerts, this gives the commander a basis for searching the room; and the presence of the detector dog in a common hallway did not violate Alexander's expectation of privacy. Also in *United States v. Lewis*, 11 MJ 188 (CMA 1981), this Court upheld an NCO's looking into Lewis' barracks room after he could not get an answer at the door. As Chief Judge Everett stated:

> Nothing in the record demonstrates that the area around the barracks was not available for general access or that Sergeant Chestnut was peeking into the room from a location where he generally would not be allowed to be present. Under these circumstances the occupants of the room had no reasonable expectation of privacy with respect to passersby—whether casual or official—who looked into the room through an opening available in the window.

*Id.* at 191.

Likewise, we held that in *United States v. Wisniewski*, 21 MJ 370 (CMA), *cert. denied*, 476 U.S. 1160, 106 S.Ct. 2281, 90 L.Ed.2d 723 (1986), a noncommissioned officer could look through the blinds in the barracks used for the soldiers and their guests without violating the occupant's expectation of privacy.

Implicitly the majority distinguishes those cases because officers and noncommissioned officers were performing their duties in or near the barracks.[2] The majority in effect indicates that a BOQ duplex is more like a multi-dwelling unit than a barracks. I agree.

I conclude that the patio is part of the curtilage which normally is used for recreational activities. Therefore, appellant's BOQ patio is covered by the Fourth Amendment.

## II. Protection

I must next consider whether the investigators needed a search warrant or whether

their presence justified an exception to the warrant requirement. The Supreme Court has indicated a preference for a search authorized by a warrant absent a few specifically limited exceptions. *Mincey v. Arizona*, 437 U.S. 385, 390, 98 S.Ct. 2408, 2412, 57 L.Ed.2d 290 (1978). One such exception is the emergency or exigent circumstances exception. Mil.R.Evid. 315(g) indicates that this exception applies when a reasonable belief exists that a "delay ... would result in the removal, destruction, or concealment of" the evidence. *See also Minnesota v. Olson*, 495 U.S. 91, 100, 110 S.Ct. 1684, 1690, 109 L.Ed.2d 85 (1990) (State court was essentially correct when it "observed that 'a warrantless intrusion may be justified by hot pursuit of a fleeing felon, or imminent destruction of evidence, or the need to prevent a suspect's escape, or the risk of danger to the police or to other persons inside or outside the dwelling.'" (citation omitted)). In this instance the investigators' knowledge and observations may have been sufficient to establish probable cause that there was an adulterous relationship between appellant and Mrs. S. However, after they made their observations from the field, I assume there was sufficient time to obtain a commander's authorization before approaching the patio.

## III. Exclusionary Rule

Assuming an illegal government search to which the defendant has standing to object, I must next ask whether the exclusionary rule applies and, if so, to what evidence. The critical evidence here is the testimony of Mrs. S at trial. In *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920), the Court stressed that if the evidence "is gained from an independent source [it] may be proved like any others." *Id.* at 392, 40 S.Ct. at 183. The exclusionary rule should not be used beyond the point of diminishing returns. *Alderman v. United States*, 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969). While it is unclear what is required to attenuate the taint, Justice Powell stated

---

**2.** "Looking into the window of a private residence is a search." 37 MJ at 108.

in his separate opinion in *Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975):

> The notion of the "dissipation of the taint" attempts to mark the point at which the detrimental consequences of illegal police action become so attenuated that the deterrent effect of the exclusionary rule no longer justifies its cost.

422 U.S. at 609, 95 S.Ct. at 2264.

In *Murray v. United States,* 487 U.S. 533, 537–38, 108 S.Ct. 2529, 2533, 101 L.Ed.2d 472 (1988), in a 4–3 opinion a majority of the Supreme Court set forth the philosophy behind the independent-source rationale as follows:

> Our cases have used the concept of "independent source" in a more general and a more specific sense. The more general sense identifies *all* evidence acquired in a fashion untainted by the illegal evidence-gathering activity. Thus, where an unlawful entry has given investigators knowledge of facts *x* and *y,* but fact *z* has been learned by other means, fact *z* can be said to be admissible because derived from an "independent source." ...
>
> The original use of the term, however, and its more important use for purposes of this case, was more specific. It was originally applied in the exclusionary rule context, by Justice Holmes, with reference to that particular category of evidence acquired by an untainted search *which is identical to the evidence unlawfully acquired*—that is, in the example just given, the knowledge of facts *x* and *y* derived from an independent source.

From the various rationales set forth, one can see the difficulty of applying the independent-source doctrine.

There are, however, various factors that may be examined: the lapse of time between the illegal conduct and the derivative evidence; the nature of the relationship between the witness and the original illegality; and voluntary acts of third parties. *Brown v. Illinois,* 422 U.S. at 590, 95 S.Ct. at 2254.

In this instance there is a gap of nearly 4 months between the date of the investigator's observations and Mrs. S's testimony at trial. Even without the action of the law enforcement officials, the record indicates that there were a number of witnesses known to Mrs. S who could testify as to the relationship between Mrs. S. and appellant, other than the three who testified at trial. Clearly, Mrs. S knew that others were aware of her affair with appellant.

More important is the voluntary act of a third party, in this instance Mrs. S. The volitional act of a testifying witness should be treated differently from secondary physical evidence discovered through a constitutional violation. *Compare People v. Eddy,* 349 Mich. 637, 85 N.W.2d 117 (1957), with *People v. Albea,* 2 Ill.2d 317, 118 N.E.2d 277 (1954). However, this case differs from both *Eddy* and *Albea* in that the witnesses were not discovered as a result of the illegal conduct but were known months in advance.

The Supreme Court addressed the volitional act of a witness in *United States v. Ceccolini,* 435 U.S. 268, 98 S.Ct. 1054, 55 L.Ed.2d 268 (1978). *Cf. New York v. Harris,* 495 U.S. 14, 110 S.Ct. 1640, 109 L.Ed.2d 13 (1990) (Court upheld admissibility of defendant's statement made shortly after his arrest in violation of *Payton v. New York,* 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980)). In *Ceccolini,* the Court did not accept the Government's suggestion of "a *per se* rule that the testimony of a live witness should not be excluded at trial no matter how close and proximate the connection between it and a violation of the Fourth Amendment." 435 U.S. at 274–75, 98 S.Ct. at 1059. Chief Justice Burger, however, writing separately, indicated he would have accepted the Government's *per se* rule to "alleviate the burden—now squarely thrust upon courts." *Id.* at 285, 98 S.Ct. at 1065. The Court recognized the case could be decided on narrower grounds.

Then–Justice Rehnquist, writing for the majority in *Ceccolini,* stated, "[T]he degree of free will necessary to dissipate the taint will very likely be found more often in the

case of live-witness testimony than other kinds of evidence." *Id.* at 276–77, 98 S.Ct. at 1060. He emphasized:

> Another factor which not only is relevant in determining the usefulness of the exclusionary rule in a particular context, but also seems to us to differentiate the testimony of all live witnesses—even putative defendants—from the exclusion of the typical documentary evidence, is that such exclusion would perpetually disable a witness from testifying about relevant and material facts, regardless of how unrelated such testimony might be to the purpose of the originally illegal search or the evidence discovered thereby. Rules which disqualify knowledgeable witnesses from testifying at trial are, in the words of Professor McCormick, "serious obstructions to the ascertainment of truth"; accordingly, "[f]or a century the course of legal evolution has been in the direction of sweeping away these obstructions." C. McCormick, Law of Evidence § 71 (1954).

435 U.S. at 277, 98 S.Ct. at 1061.

Justice Rehnquist indicated that the witness' testimony was "of her own free will" and not "coerced" or "induced by official authority"; the illegally-obtained evidence was not used in questioning her; nearly a year transpired between the search and the first contact with the witness; her identity was known prior to the search; and there was "not the slightest evidence" that the officer made the search "with the intent of finding a willing and knowledgeable witness to testify against" defendant. *Id.* at 279–80, 98 S.Ct. at 1062. Because of these five factors, the Court did not have to adopt a *per se* volitional-act rule.

In this case there was not the slightest indication that the search was made to obtain the identity of the already known witness, Mrs. S. The majority of cases applying the attenuation and independent-source doctrines do so when police, like the investigators in this case, have prior knowledge of the existence of the witness, the location of the witness, and the connection of the witness with the defendant. *Lockridge v.*

*Superior Court,* 3 Cal.3d 166, 89 Cal.Rptr. 731, 474 P.2d 683, 686 (1970) ("[E]ven if the witness was discovered as a result of illegal police conduct, his testimony is admissible if [it] would have been discovered in the normal course of a lawfully conducted investigation."); *State v. McBarron,* 224 Kan. 710, 585 P.2d 1041 (1978) (witness known prior to illegal arrest of defendants); *State v. Roe,* 612 S.W.2d 192 (Tenn. Crim.App.1980) (before illegal arrest police knew identity of one witness and that witness named the others); *State v. O'Bremski,* 70 Wash.2d 425, 423 P.2d 530 (1967) (existence and identity of witness known prior to illegally entering defendant's apartment). This case is unlike the cases where courts have held that witness testimony was not attenuated because the identity of the witness was not known prior to the illegal conduct. *E.g., United States v. Ramirez–Sandoval,* 872 F.2d 1392 (9th Cir. 1989).

The presumptive taint of the illegal search is severed in this case because much of what was known was gained 2 months prior to the illegal presence on the patio. Whether Mrs. S was unsure if she was told about the observation before or after her written statement is immaterial. In fact, the date of the observation was the last date charged. As she indicated, they had been together numerous times before the 29th of June, a fact observed by Lieutenant Morely at appellant's BOQ numerous evenings. During these evenings one could easily draw the inference that they were not saying a *Pater Noster.*

Chief Judge Brown of the Court of Appeals for the Fifth Circuit stated in *Gissendanner v. Wainwright,* 482 F.2d 1293, 1296 (1973), "[B]eguiling as it is, we resist the temptations of the serpent of another tree, not only to eat, but swallow the fruit or the fruit of the fruit, or the theory of the fruit, poisoned, palatable or forbidden." I fear that the majority has taken the actions of the investigators on June 29 to do a reverse poisoning.

Since I would hold that Mrs. S's testimony at trial was admissible under the inde-

pendent-source doctrine, it is not necessary for me to discuss the inevitable-discovery doctrine. I further conclude that Mrs. S's testimony would be sufficient without the investigator's testimony to sustain the conviction for sodomy and adultery between May 4 and June 28, 1990.

I would affirm the decision of the Court of Military Review.[3]

3. If a rehearing was authorized, the Government might establish why Mrs. S was willing to testify or how the police carried out similar investigations on the same installation concerning adulterous or improper relationships between officers and other individuals.