**UNITED STATES, Appellant,**

v.

**Corporal Ricardo JONES, Jr., United States Army, Appellee.**

**ARMY MISC 20060858.**

U.S. Army Court of Criminal Appeals.

31 Jan. 2007.

For Appellee: Major Tyesha E. Lowery, JA (argued); Colonel John T. Phelps II, JA; Lieutenant Colonel Steven C. Henricks, JA; Major Billy B. Ruhling II, JA (on brief).

For Appellant: Captain Robert C. Stelle, JA (argued); Colonel John W. Miller II, JA; Lieutenant Colonel Kevin Boyle, JA; Captain Larry W. Downend, JA; Captain Micah D. Pharris, JA (on brief).

Before SCHENCK, Senior Judge, ZOLPER, and WALBURN, Appellate Military Judges.

OPINION OF THE COURT AND ACTION ON APPEAL BY THE UNITED STATES FILED PURSUANT TO ARTICLE 62, UNIFORM CODE OF MILITARY JUSTICE

SCHENCK, Senior Judge:

The government's timely appeal under Article 62, Uniform Code of Military Justice, 10 U.S.C. § 862 [hereinafter UCMJ], is hereby granted. The military judge's decision to suppress the trial testimony of Specialist (SPC) Fernando Carrillo is vacated.

## FACTS

Appellee was charged with conspiring with SPC Carrillo to import marijuana from Tijuana, Mexico, possessing ninety-six ounces of marijuana with intent to distribute, and importing ninety-six ounces of marijuana into the United States, in violation of Articles 81 and 112a, UCMJ, 10 U.S.C. §§ 881 and 912a. At arraignment, appellee's trial defense counsel moved to suppress evidence seized during a search of a hotel room which appellee occupied. The evidence seized included marijuana, a book bag, zip-lock bags, a digital scale, a box of ammunition, and a 9–millimeter handgun with a magazine inserted that contained thirteen rounds. Appellee's defense counsel also moved to suppress derivative evidence including any statements appellee made at the hotel room immediately after the marijuana was seized, the written, sworn statement[1] of the co-accused, SPC Carrillo, made in response to questioning by special agents from the U.S. Army Criminal Investigation Command (CID) at Fort Riley, and SPC Carrillo's future, in-court testimony.

Deputy Sheriff Willie Wallenberg of Geary County, Kansas, was the only witness who testified during the Article 39a, UCMJ, 10 U.S.C. § 839a, motion hearing. In addition to Deputy Wallenberg's testimony, the military judge considered the defense motion, government response, and documents attached thereto, including: (1) Deputy Wallenberg's affidavit; (2) Deputy Wallenberg's Certificate of Service for Protection from

---

1. Although trial defense counsel did not specifically move to suppress SPC Carrillo's written statement, the statement is part of the derivative evidence obtained from the search of the hotel room.

Abuse Order; (3) Notice of Hearing and Temporary Orders of Protection; (4) summarized transcript of Deputy Wallenberg's testimony at appellee's Article 32, UCMJ, hearing; (5) summarized transcript of Deputy Wallenberg's testimony at SPC Carrillo's Article 32, UCMJ, hearing; and (6) SPC Carrillo's written, sworn statement. The military judge also considered the following documents from SPC Carrillo's case: (1) stipulation of fact; (2) offer to plead guilty, including the quantum portion; (3) report of result of trial; and (4) rights waiver form. Lastly, the military judge considered the summarized transcripts of testimony from SPC Carrillo's former company commander and CID Investigator Jurina given at SPC Carrillo's Article 32 hearing. The military judge's findings of fact for the motion to suppress are consistent with Deputy Wallenberg's testimony and the other evidence he considered.

On 3 April 2006 at 2312, Deputy Wallenberg went to the wrong room (Room 110) at the Red Carpet Inn in Grandview Plaza, Kansas, to serve a Protection from Abuse Order on an African–American male, Phillip Jeffery. When Deputy Wallenberg knocked on the hotel room door, appellee, an African–American male, answered the door. Deputy Wallenberg asked appellee if he was Jeffery, and appellee "said he was not." Deputy Wallenberg then asked him for identification from outside the door, and appellee walked back into the room, leaving the door open. While standing outside the door, Deputy Wallenberg smelled the odor of raw marijuana "coming out of the room," and believed marijuana might have been in the room at one time.

When appellee turned to retrieve his identification, Deputy Wallenberg took "two to three steps into the room" for "[o]fficer safety reasons."[2] While in the room, he saw a book bag with zip-lock bags sticking out of it that appeared to contain marijuana. After handcuffing appellee and a female suspect who was also in appellee's room, Deputy Wallenberg found a box of ammunition inside the book bag, and three empty zip-lock bag boxes in a dresser drawer. No one else was present in the room. Another officer who arrived at the scene located a loaded 9–millimeter handgun containing thirteen rounds under a mattress and a digital scale.

The Geary County officers went to the hotel manager's office and discovered that SPC Carrillo rented the room. They then informed the CID, which interviewed SPC Carrillo the next morning at Fort Riley. Investigator Jurina told SPC Carrillo that appellee had been arrested in the hotel room rented in SPC Carrillo's name. Investigator Jurina advised SPC Carrillo he was suspected of conspiracy and wrongful possession, use, and distribution of a controlled substance, and further advised him of his rights under Article 31(b), UCMJ, 10 U.S.C. § 831(b), and *Miranda*.[3] Specialist Carrillo acknowledged he understood his rights and agreed to make a statement without the presence of a lawyer. After waiving his rights at 0913 on 4 April 2006, SPC Carrillo

---

2. The military judge found Deputy Wallenberg's entry was unlawful because it occurred without appellee's consent (express or implied), without a warrant (arrest or search), and without probable cause and exigent circumstances. Probable cause to enter and search exists when police officers reasonably believe a sought-after person, property, or evidence is located on the premises or on the person they wish to search. *See* Military Rule of Evidence [hereinafter Mil. R. Evid.] 315. Exigent circumstances exist where, for example, the passage of time would permit a suspect to destroy evidence, police officers are in hot pursuit of a fleeing felon, an ongoing emergency exists on the premises, i.e., a fire, or conditions exist extremely adverse to officer safety. *See* Mil. R. Evid. 315; *see, e.g., Georgia v. Randolph*, 547 U.S. 103, 126 S.Ct. 1515, 1525 n. 6, 164 L.Ed.2d 208 (2006); *Welsh v. Wisconsin*, 466

U.S. 740, 749–50, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984). The military judge found that Deputy Wallenberg "did not feel threatened by" appellee, "did not think [appellee] was under the influence of drugs [or alcohol]," and "had no reason to believe that anyone else was in the room." The military judge further found appellee did not invite Deputy Wallenberg into the room, and, although Deputy Wallenberg "smelled the odor of raw marijuana," he only thought marijuana "might have been ... in that room at one time." Therefore, the military judge concluded Deputy Wallenberg unlawfully entered the hotel room. The government does not now challenge the military judge's ruling in this matter. *See* note 19, *infra* (noting "law of the case" doctrine).

3. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

provided the CID a written, sworn confession at 1300.

In his confession, SPC Carrillo explained he and appellee were in Mexicali, Mexico, visiting SPC Carrillo's sick grandmother. Specialist Carrillo drove without appellee to Tijuana, Mexico, and purchased five kilograms (approximately eleven pounds) of marijuana for $1200.00 from an "unknown Mexican drug dealer." They brought the marijuana into the United States hidden in a speaker box in SPC Carrillo's car. During the return trip, SPC Carrillo rented a room at the Red Carpet Inn in Kansas for five days. Specialist Carrillo, appellee, and appellee's female "friend" stayed in the hotel room for two days. Thereafter, SPC Carrillo returned to Fort Riley and left appellee and the female alone in the room for the remaining three days. Specialist Carrillo and appellee kept the marijuana in the hotel room and smoked one to two ounces. Immediately prior to Deputy Wallenberg's arrival at the room, they had smoked some amount of marijuana. Specialist Carrillo also explained he and appellee packaged the marijuana in zip-lock bags, and appellee brought a 9–millimeter handgun into the room.

Subsequently, on 31 July 2006, SPC Carrillo offered to plead guilty. On 7 August 2006, consistent with his pleas, SPC Carrillo was found guilty of possessing marijuana with intent to distribute, importation and use of marijuana, and use of methamphetamines (one specification each), in violation of Article 112a, UCMJ. In SPC Carrillo's pretrial agreement, he agreed to "testify truthfully and cooperate with the government in the investigation of and any resulting trial

against" appellee, and agreed to do so without a grant of immunity.[4] Specialist Carrillo's pretrial agreement also stated he agreed to "waive the *Defense Motion to Suppress under [Mil. R. Evid.] 311*, dated 10 July 2006."[5]

We also take judicial notice of our own record and the existence and conclusion of court-martial proceedings in SPC Carrillo's case. *See United States v. Lovett*, 7 U.S.C.M.A. 704, 708, 23 C.M.R. 168, 172, 1957 WL 4455 (1957) ("An appellate court, however, can take judicial notice of its own records."); *United States v. Jackson*, 2 C.M.R. 96, 98, 1952 WL 1700 (C.M.A.1952) (noting and citing to "authority in both service and civilian cases for ... taking judicial notice of the record of trial in another court-martial"); *United States v. Moses*, 11 C.M.R. 281, 285, 1953 WL 2020 (A.B.R.1953) ("The board of review may take judicial notice of the record of trial in a companion court-martial."); *United States v. Lawrence*, 1 C.M.R. 248, 252, 1951 WL 1608 (A.B.R.1951) ("We may take judicial notice of our own official records in certain instances."). Without noting specific facts contained within the record itself, we take judicial notice that on 15 August 2006, SPC Carrillo, consistent with his pleas, was convicted at a general court-martial. Specialist Carrillo submitted his case to this court on its merits, and we subsequently affirmed the findings of guilty and the sentence in an unpublished decision. *See United States v. Carrillo*, ARMY 20060790 (Army Ct.Crim.App. 8 Jan. 2007) (unpub.).

4. Our superior court has recognized that,

[c]onsistent with ... federal practice, a general court-martial convening authority may grant a servicemember immunity from the use of [his] testimony, statements, or any other information derived directly or indirectly from such immunized testimony or statements [against him] in a subsequent court-martial. *See* [Rule for Courts–Martial [hereinafter R.C.M.]] 704(a), (c). After receiving such immunity, an immunized servicemember may be ordered to give a statement or to testify because the grant of immunity removes the right to refuse to cooperate on self-incriminating grounds. *See* R.C.M. 704(d) discussion; [Mil. R. Evid.] 301(c). Neither the testimony of an immu-

nized soldier, nor any evidence derived from such testimony, may be used against the immunized soldier at a subsequent trial, other than for perjury, false swearing, making a false official statement, or failure to comply with an order to testify.

*United States v. Mapes*, 59 M.J. 60, 66 (C.A.A.F. 2003).

5. At his own court-martial, SPC Carrillo submitted, but never litigated, a motion "to suppress all evidence obtained as a result of the Government's illegal search of [SPC Carrillo's] hotel room on 3 April 2006[,] as well as any evidence derived from that illegal search[,] including [SPC Carrillo's] statement to investigators on 4 April 2006."

After receiving evidence and hearing argument on appellee's suppression motion, the military judge concluded the government had "not shown by clear and convincing evidence" that Deputy Wallenberg entered the hotel room based on express or implied consent.[6] Specifically, the military judge found "Deputy Wallenberg's entry into the room was unlawful, because it was without consent, and without probable cause and exigent circumstances." Furthermore, the primary evidence "would not have been obtained if the [subsequent,] unlawful search had not been made." Had Deputy Wallenberg not unlawfully entered the room, the military judge concluded "he would [have] left [the scene] and taken no further investigative steps in this case."

As for the derivative evidence, the military judge held:

> [T]he government [did not show] by a preponderance of the evidence that any of [the derivative evidence [7]] was not obtained as a result of the unlawful search or that the evidence ultimately would[ have] been obtained by lawful means even if the unlawful search had not been made. Without the unlawful search, Deputy Wallenberg never would[ have] entered the room;[8] the government would not have the marijuana, because it was not in plain view without the entry into the room. There would have been no arrests and no searches incident to arrest. The government would not have any of the evidence seized from the

room. Also, [SPC] Carrillo would never have even been questioned, let alone, waive[d] his rights and confess[ed]. Furthermore, the confession was close in time to the unlawful search.

> There were no intervening circumstances sufficient to cause the taint to be attenuated. Even though [SPC] Carrillo was not informed of all the seized property, he was informed that the accused had been arrested. That[,] and the offenses of which he was suspected[,] obviously had an impact on his confession. *Also, as far as the in-court testimony of [SPC] Carrillo, the government has not shown by a preponderance of the evidence that [SPC] Carrillo would[ have] entered into this pretrial agreement or testified against his interests without the government having the marijuana and his confession. To the contrary, it is extremely unlikely that there would be a pretrial agreement or that [SPC] Carrillo would testify in this case if the government did not have the marijuana or [SPC] Carrillo's confession.* Accordingly, the defense motion to suppress is granted.

(Emphasis added.)

## LAW

### Standard of Review

■ Our court reviews a military judge's ruling on the suppression of evidence for an

---

6. Pursuant to Mil. R. Evid. 314(e)(5), the government must show by clear and convincing evidence that a valid consent to search was given. Generally, to overcome a defense motion to suppress evidence obtained from a search or seizure, the government must prove,

> by a preponderance of the evidence[,] that the evidence was not obtained as a result of an unlawful search or seizure, that the evidence would have been obtained even if the unlawful search or seizure had not been made, or that the evidence was obtained by officials who reasonably and with good faith relied on the issuance of an authorization to search, seize, or apprehend or a search warrant or an arrest warrant.

Mil. R. Evid. 311(e)(1).

7. To admit derivative evidence obtained from an unlawful search or seizure, a military judge must find,

> by a preponderance of the evidence[,] that the evidence was not obtained as a result of an

unlawful search or seizure, that the evidence ultimately would have been obtained by lawful means even if the unlawful search or seizure had not been made, or that the evidence was obtained by officials who reasonably and with good faith relied on the issuance of an authorization to search, seize or apprehend or a search warrant or an arrest warrant.

Mil. R. Evid. 311(e)(2).

8. Despite the military judge's use of the term "unlawful search" at this point in his conclusions of law, Deputy Wallenberg first entered the hotel room without justifying, exigent circumstances or probable cause, followed by: (1) a visual protective sweep; (2) a plain view search and seizure of the marijuana and other paraphernalia; (3) the detainment of appellee and appellee's female friend; and (4) a search incident to appellee's subsequent arrest.

abuse of discretion. *United States v. Datz,* 61 M.J. 37, 42 (C.A.A.F.2005). This means that in the course of our review, we conduct a two-part analysis whereby we examine the military judge's findings of fact using a clearly-erroneous standard and his or her conclusions of law de novo. *United States v. Rodriguez,* 60 M.J. 239, 246 (C.A.A.F.2004).

When ruling on government interlocutory appeals made pursuant to Article 62(b), UCMJ, our court "may act only with respect to matters of law." We may not make additional findings of fact; rather, "[o]n questions of fact, [our] court is limited to determining whether the military judge's findings are clearly erroneous or unsupported by the record. If the findings are incomplete or ambiguous, the 'appropriate remedy ... is a remand for clarification' or additional findings." *United States v. Lincoln,* 42 M.J. 315, 320 (C.A.A.F.1995) (quoting *United States v. Kosek,* 41 M.J. 60, 64 (C.M.A.1994)). Moreover, we are "bound by the military judge's factual determinations unless they are unsupported by the record or clearly erroneous." *United States v. Gore,* 60 M.J. 178, 185 (C.A.A.F.2004). This court may not "find its own facts or substitute its own interpretation of the facts." *United States v. Cossio,* 64 M.J. 254, 256 (C.A.A.F.2007) (citing *United States v. Mizgala,* 61 M.J. 122, 127 (C.A.A.F. 2005)). However, we review questions of law de novo. *Kosek,* 41 M.J. at 63; *United States v. Rittenhouse,* 62 M.J. 509, 511 (Army Ct.Crim.App.2005).

*Exclusionary Rule*

The Fourth Amendment to the United States Constitution states that "[t]he right of the people to be secure ... against unreasonable searches and seizures[ ] shall not be violated." However, the Amendment does not expressly preclude using "evidence obtained in violation of its commands, and an examination of its origin and purposes makes clear that the use of fruits of a past unlawful search or seizure '[works] no new Fourth Amendment wrong.'" *United States v. Leon,* 468 U.S. 897, 906, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984) (quoting *United States v.*

*Calandra,* 414 U.S. 338, 354, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974)).

Nevertheless, the judicially-created exclusionary rule does prohibit

> introduction of evidence of tangible materials seized during an unlawful search,[9] and of testimony concerning knowledge acquired during an unlawful search.[10] Beyond that, the exclusionary rule also prohibits the introduction of derivative evidence, both tangible and testimonial, that is the product of the primary evidence, or that is otherwise acquired as an indirect result of the unlawful search, up to the point at which the connection with the unlawful search becomes "so attenuated as to dissipate the taint."

*Murray v. United States,* 487 U.S. 533, 536–37, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988) (quoting *Nardone v. United States,* 308 U.S. 338, 341, 60 S.Ct. 266, 84 L.Ed. 307 (1939)); *see also Wong Sun v. United States,* 371 U.S. 471, 484, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963) (holding "[t]he exclusionary prohibition extends as well to the indirect as [to] the direct products of such invasions").

Cases following *Wong Sun* and its progeny "have confirmed, the exclusionary sanction applies to any 'fruits' of a [C]onstitutional violation—whether such evidence be tangible, physical material actually seized in an illegal search, items observed or words overheard in the course of the unlawful activity, or confessions or statements of the accused obtained during an illegal arrest and detention." *United States v. Crews,* 445 U.S. 463, 470, 100 S.Ct. 1244, 63 L.Ed.2d 537 (1980) (internal footnotes omitted).

Moreover, the fruit of the poisonous tree doctrine—a facet of the exclusionary rule of evidence—extends the scope of the rule by barring the admissibility of not only evidence directly seized, but also evidence indirectly obtained as a result of information learned or leads obtained in the unlawful search. "It is generally held that the fruit of the poisonous tree doctrine bars not only derivative physical evidence, but also derivative testimonial evidence, such as confessions and admissions

---

9. *Weeks v. United States,* 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914).

10. *Silverman v. United States,* 365 U.S. 505, 81 S.Ct. 679, 5 L.Ed.2d 734 (1961).

obtained as a result of confronting the accused with information learned in an unlawful search, and the testimony of witnesses discovered as a result of an unlawful search." Gary D. Spivey, Annotation, *Comment Note—"Fruit of the Poisonous Tree" Doctrine Excluding Evidence Derived from Information Gained in Illegal Search*, 43 A.L.R.3d 385 (1972) (current through 2006) (internal footnotes omitted).[11] Because the exclusionary rule and the fruit of the poisonous tree doctrine are essentially one in the same—the former pertaining to primary evidence and the latter pertaining to derivative evidence—we will use the term "exclusionary rule" when discussing the suppression or exclusion of both primary and derivative evidence.

"[T]he exclusionary rule is neither intended nor able to cure the invasion of the defendant's rights which he has already suffered." *Leon*, 468 U.S. at 906, 104 S.Ct. 3405 (internal quotation marks omitted). Consequently, the rule "operates as 'a judicially[-]created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal [C]onstitutional right of the party aggrieved.'" *Id.* (quoting *Calandra*, 414 U.S. at 348, 94 S.Ct. 613).

The exclusionary rule "has never been interpreted to proscribe the introduction of illegally[-]seized evidence in all proceedings or against all persons." *Stone v. Powell*, 428 U.S. 465, 486, 96 S.Ct. 3037, 49 L.Ed.2d 1067

(1976). Rather, courts restrict applying the rule "to those areas where its remedial objectives are thought most efficaciously served." *Calandra*, 414 U.S. at 348, 94 S.Ct. 613.[12]

As the Supreme Court recently reiterated:

Suppression of evidence … has always been [the] last resort, not [the] first impulse. The exclusionary rule generates "substantial social costs"[13] which sometimes include setting the guilty free and the dangerous at large. We have therefore been "cautio[us] against expanding" it,[14] and "have repeatedly emphasized that the rule's 'costly toll' upon truth-seeking and law enforcement objectives presents a high obstacle for those urging [its] application."[15]

*Hudson v. Michigan*, —— U.S. ——, ——, 126 S.Ct. 2159, 2163, 165 L.Ed.2d 56 (2006).

In analyzing whether to apply the exclusionary rule, the Supreme Court has declined to apply the rule "except where its deterrence benefits outweigh its substantial social costs." *Id.* at 2165 (internal quotation marks omitted). In deciding whether to suppress "fruit of the poisonous tree," the Court has further urged: " 'The penalties visited upon the Government, and in turn upon the public, because its officers have violated the law must bear some relation to the purposes which the law is to serve.'" *Id.* at 2164 (quoting *Ceccolini*, 435 U.S. at 279, 98 S.Ct. 1054).

---

11. *See Nardone*, 308 U.S. at 338, 60 S.Ct. 266; *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920).

12. Many exceptions irrelevant in the instant case have also diminished the applicability of the exclusionary rule. *See, e.g., Pennsylvania Bd. of Probation and Parole v. Scott*, 524 U.S. 357, 118 S.Ct. 2014, 141 L.Ed.2d 344 (1998) (exclusionary rule exception for parole revocation proceedings); *New York v. Harris*, 495 U.S. 14, 110 S.Ct. 1640, 109 L.Ed.2d 13 (1990) (exclusionary rule exception for using defendant's statement made outside house after illegal, in-house arrest); *Leon*, 468 U.S. at 897, 104 S.Ct. 3405 (exclusionary rule exception where police officer executes defective search warrant in "good faith"); *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) ("good faith" exception to exclusionary rule); *Nix v. Williams*, 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984) ("in-

evitable discovery" exception to exclusionary rule); *United States v. Ceccolini*, 435 U.S. 268, 98 S.Ct. 1054, 55 L.Ed.2d 268 (1978) ("attenuated connection" exception to exclusionary rule); *Calandra*, 414 U.S. at 338, 94 S.Ct. 613 (exclusionary rule exception for grand jury proceedings); *Walder v. United States*, 347 U.S. 62, 74 S.Ct. 354, 98 L.Ed. 503 (1954) (exclusionary rule exception for impeachment purposes); *Silverthorne Lumber Co.*, 251 U.S. at 385, 40 S.Ct. 182 ("independent source" exception to exclusionary rule).

13. *Leon*, 468 U.S. at 907, 104 S.Ct. 3405.

14. *Colorado v. Connelly*, 479 U.S. 157, 166, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986) (alteration in original).

15. *Scott*, 524 U.S. at 364–65, 118 S.Ct. 2014 (alteration in original).

In other words, in the present case, we must consider the interest protected by the restrictions for unlawful entry ("social costs") as well as the deterrence benefits. *See id.* at 2165–67. The Court has specifically noted that because "the cost of excluding live-witness testimony often will be greater, a closer, more direct link between the illegality and that kind of testimony is required." *Ceccolini,* 435 U.S. at 278, 98 S.Ct. 1054. Moreover, "the exclusionary rule should be invoked with much greater reluctance where the claim is based on a causal relationship between the [C]onstitutional violation and the discovery of a live witness than when a similar claim is advanced to support suppression of an inanimate object." *Id.* at 280, 98 S.Ct. 1054.

### Exclusionary Rule Applied to Witness Trial Testimony

In conducting this cost-benefit analysis, the Supreme Court has consistently held: "Even in situations where the exclusionary rule is plainly applicable, [they] have declined to adopt a 'per se or "but for"' rule that would make inadmissible any evidence, whether tangible or live-witness testimony, which somehow came to light through a chain of causation that began with an illegal arrest." *Id.* at 276, 98 S.Ct. 1054; *see Hudson,* —— U.S. at ——, 126 S.Ct. at 2164; *Harris,* 495 U.S. at 17, 110 S.Ct. 1640; *Leon,* 468 U.S. at 910, 104 S.Ct. 3405; *Segura v. United States,* 468 U.S. 796, 815, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984); *Brown v. Illinois,* 422 U.S. 590, 599, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975). The Court has also "held that a witness' testimony may be admitted even when his identity was discovered in an unconstitutional search." *Leon,* 468 U.S. at 910, 104 S.Ct. 3405 (citing *Ceccolini,* 435 U.S. at 268, 98 S.Ct. 1054).

Initially, in *Brown,* 422 U.S. at 590, 95 S.Ct. 2254, the Court identified factors relevant to assessing whether a *defendant's* confession must be suppressed as fruit of the poisonous tree. Specifically, as the Court reaffirmed in *Harris:* "An inquiry into whether a suspect's statement is properly treated as attributable to a Fourth Amendment violation or to the suspect's independent

dent act of will," and sufficiently attenuated, must consider *"the length of time between the arrest and the statement, the presence of intervening circumstances, and the purpose and flagrancy of the violation."* *Harris,* 495 U.S. at 23, 110 S.Ct. 1640 (emphasis added) (internal quotation marks omitted); *see also United States v. Khamsouk,* 57 M.J. 282, 292–93 (C.A.A.F.2002) (applying the *Brown* factors to warrantless entry followed by immediate consent search of belongings, then later inculpatory statement and further search of belongings after Article 31, UCMJ, rights warning given).

▇▇▇ While further rejecting the notion that, "if the road were uninterrupted, its length [is] immaterial[,]" the Supreme Court instead set forth factors for the judiciary to weigh in determining whether to exclude evidence consisting of *live-witness testimony* derived from unlawful police activity. *Ceccolini,* 435 U.S. at 275, 98 S.Ct. 1054. First, the Court directed lower courts to consider the *"degree of free will exercised by the witness"* because "[t]he greater the willingness of the witness to freely testify, the greater the likelihood that he or she will be discovered by legal means and, concomitantly, the smaller the incentive to conduct an illegal search to discover the witness." *Id.* at 276, 98 S.Ct. 1054 (emphasis added). Courts must consider the *time lapse* "between the time of the illegal search and the initial contact with the witness, on the one hand, and between the latter and the testimony at trial on the other." *Id.* at 279, 98 S.Ct. 1054. Courts must also account for the *role of the original illegal law enforcement activity* in obtaining the witness' testimony and the law enforcement's *purpose and flagrancy* of that conduct. *Id.* (citing *McGuire v. United States,* 273 U.S. 95, 99, 47 S.Ct. 259, 71 L.Ed. 556 (1927)). Finally, courts must conduct a *cost-benefit analysis* by comparing the cost on the "evenhanded system of law enforcement" (due to excluding live-witness testimony and "permanently silencing" a witness) with the beneficial "deterrent effect." *Id.* at 280, 98 S.Ct. 1054.[16]

---

16. *See also United States v. Duckworth,* 9 M.J. 861, 865 (A.C.M.R.1980) (stating the *Ceccolini*

factors include "the status of the witness, *e.g.,* accomplice or innocent bystander, the extent of

We also find persuasive authority from the Sixth Circuit Court of Appeals in *United States v. Akridge*, 346 F.3d 618 (6th Cir. 2003), *cert. denied*, 540 U.S. 1203, 124 S.Ct. 1469, 158 L.Ed.2d 122 (2004).[17] In *Akridge*, the court applied the *Brown* and *Ceccolini* factors and found admissible the trial testimony from two putative co-defendants, Ellison and Stewart, identified during an illegal law enforcement search and seizure. *Akridge*, 346 F.3d at 624, 631–32. In January 1999, police officers seized marijuana and firearms from the apartment of Ellison, a previously convicted felon. In May 2000, the police received an anonymous tip asserting drug activity at Ellison's apartment, which, at this point, Ellison was sharing with his girlfriend, Stewart, and with Akridge. Police officers arrived at the apartment, engaged in a "knock and talk" at the door, and ultimately conducted an unlawful search. The search resulted in the seizure of marijuana, cocaine, and three loaded handguns. Ellison, Stewart, and Akridge eventually confessed to selling crack cocaine and marijuana. Ellison and Stewart then entered into plea agreements with the government. Although the district court suppressed Akridge's statement and the evidence seized from the apartment, it did not suppress Ellison and Stewart's trial testimony. The Sixth Circuit held the district court properly denied Akridge's suppression motion. *Id.* at 624.

■ In reviewing the circumstances in *Akridge*—circumstances similar to those in appellee's case—the Sixth Circuit considered the following additional factors:

the stated willingness of the witness to testify; the presence of intervening circumstances; the time, place, and manner of the initial questioning of the witness; whether the witness himself was a defendant; whether the illegally-seized evidence was used in questioning the witness; the time between the illegal search and initial contact with the witness; whether investigators knew of the relationship, if any, between the witness and the defendant prior to the illegal search; and whether the police conducted the illegal search intending to find evidence implicating the defendant.

*Id.* at 626.

## DISCUSSION

■ The government does not now appeal the military judge's ruling suppressing the physical evidence seized (following the initial warrantless entry) from the hotel room [18] or

---

free will exercised by the witness in testifying, the relationship of the testimony to the original illegality, and the cost to the criminal justice system of excluding live[-]witness testimony"). Two years after the Supreme Court's decision in *Ceccolini*, our court applied these factors in *Duckworth* without the benefit of subsequent Supreme Court decisions which followed in its wake. We find the result in *Duckworth* limited to its facts, and distinguish it from the present case. In *Duckworth*, the driver of the car—a witness against the accused—was illegally detained, and initially questioned without any rights warning, at the scene of an illegally-conducted car stop. In the present case, *civilian police officers* discovered SPC Carrillo's name after asking the hotel manager to identify the occupant of the room they just searched. This inquiry, in and of itself, is not an illegal search, and is indirectly related to Deputy Wallenberg's unlawful entry and illegal search. Additionally, *military investigators* questioned SPC Carrillo the morning after appellee had been arrested, and after SPC Carrillo waived his Article 31 rights. Second, in *Duckworth*, we found "the flagrant police misconduct [of] the type that would respond to and could be deterred by invoking the exclusionary rule." *Id.* at 865. In this case, we

find Deputy Wallenberg took two or three steps into the hotel room to ensure officer safety, behavior "not likely to be affected by prior consideration of the consequences." *Id.* at 866.

**17.** *See also United States v. Butner*, 15 M.J. 139 (C.M.A.1983) (finding live-witness testimony from accomplice correctly received into evidence because accomplice's voluntary decisions to speak with law enforcement and confess to first sergeant broke causal chain between accused's tainted confession and accomplice's trial testimony); *United States v. Reyes*, 157 F.3d 949 (2d Cir.1998) (finding testimony from live witness, discovered during illegal search of handheld computer, sufficiently attenuated from the illegal search to neutralize the taint); *United States v. Stevens*, 612 F.2d 1226, 1229–30 (10th Cir.1979) (finding live-witness testimony from co-conspirator, pursuant to plea agreement, was "sufficiently voluntar[y]" and "attenuated from the exploitation of the illegal wiretaps to be purged of taint"), *cert. denied*, 447 U.S. 921, 100 S.Ct. 3011, 65 L.Ed.2d 1113 (1980).

**18.** Courts have extended Fourth Amendment protections applicable to one's home to include

SPC Carrillo's written, sworn confession to CID.[19] The government, however, does assert the "military judge erred by applying a legally unsupportable 'but-for' analysis in deciding to suppress the in-court testimony of SPC Carrillo as a fruit of the illegal search," and asks this court to overturn that ruling. Therefore, we must only consider whether the military judge properly excluded SPC Carrillo's trial testimony. Today, we need only address the narrow and precise question of remedy for the unlawful entry into the hotel room. In so doing, we find the military judge misapplied the law. After applying the *Ceccolini* factors, and balancing the cost of suppression against the deterrent effect of exclusion, we find the factors weigh against excluding SPC Carrillo's trial testimony. *See Akridge*, 346 F.3d at 625.

In the instant case, a lengthy sequence of events resulted in obtaining what would have been SPC Carrillo's in-court testimony.[20] Initially, Deputy Wallenberg unlawfully entered the hotel room, conducted a visual protective sweep, a plain view search and seizure, an arrest or apprehension of appellee and appellee's female friend, and then a search incident to arrest. Nevertheless, we must conduct our own review of the military judge's conclusions of law without the benefit of the rules and cases upon which he relied because the military judge did not include that information in his ruling. Without specifying the "derivative evidence" to which he refers, the military judge stated:

> [T]he government has not shown by a preponderance of the evidence that any of [the derivative evidence] was not obtained as a

result of the unlawful search or that the evidence ultimately would[ have] been obtained by lawful means even if the unlawful search had not been made.... [T]he government would not have the marijuana.... There would have been no arrests and no searches incident to arrest[, and no] ... evidence seized from the room.... Specialist Carrillo would never have even been questioned.... Furthermore, the confession was close in time to the unlawful search. There were no intervening circumstances sufficient to cause the taint to be attenuated. Even though [SPC] Carrillo *was not informed of all the seized property*, he was informed [of the accused's arrest]. That[,] and the offenses of which he was suspected[,] obviously had an impact on his confession.[21]

Our review, however, is limited to the evidence of SPC Carrillo's in-court testimony. In specifically assessing whether to exclude SPC Carrillo's trial testimony, the military judge stated:

> [A]s far as the in-court testimony of [SPC] Carrillo, the government has not shown by a preponderance of the evidence that [SPC] Carrillo would[ have] entered into this pretrial agreement or testified against his interests *without* the government having the *marijuana* and his *confession*. To the contrary, it is *extremely unlikely* that there would be a pretrial agreement or that [SPC] Carrillo would testify in this case if the government *did not* have the *marijuana* or [SPC] Carrillo's *confession*.

(Emphasis added.)[22] The military judge improperly used a "but-for" causation analysis

hotel and motel rooms and other temporary dwellings. As an occupant of SPC Carrillo's hotel room, appellee has standing to assert Fourth Amendment protections. *See Randolph*, 547 U.S. at ——, 126 S.Ct. at 1522; *Stoner v. California*, 376 U.S. 483, 490, 84 S.Ct. 889, 11 L.Ed.2d 856 (1964); *Finsel v. Cruppenink*, 326 F.3d 903, 907 (7th Cir.2003); *United States v. Richard*, 994 F.2d 244, 247 (5th Cir.1993).

19. "When a party does not appeal a ruling, the ruling of the lower court normally becomes the law of the case." *United States v. Parker*, 62 M.J. 459, 464 (C.A.A.F.2006) (citing *United States v. Doss*, 57 M.J. 182, 185 (C.A.A.F.2002)).

20. Specialist Carrillo did not testify at appellee's court-martial because the military judge granted the defense motion to suppress prior to trial.

21. Initially, this ruling appears to correspond with the requirements of Mil. R. Evid. 311(e)(2). *See* note 7, *supra*.

22. Although initially following Mil. R. Evid. 311(e)(2), the military judge did not distinguish between SPC Carrillo's live-witness testimony and physical evidence, and appears to have applied a "but for" analysis without considering the factors enumerated in *Ceccolini*. As the Supreme Court emphasized:

> The proffer of a living witness is not to be mechanically equated with the proffer of inani-

(i.e., "but-for" the illegally-obtained marijuana and confession, SPC Carrillo "would [not have] entered into this pretrial agreement or testified against his interest") rather than applying the factors described above as set forth by the Supreme Court for the judiciary to assess in-court witness testimony as "fruit of the poisonous tree" evidence. As the Supreme Court recently stated:

> [E]xclusion may not be premised on the mere fact that a [C]onstitutional violation was a "but-for" cause of obtaining evidence.... But even if the illegal entry ... could be characterized as a but-for cause of discovering what was inside, we have "never held that evidence is 'fruit of the poisonous tree' simply because 'it would not have come to light but for the illegal actions of the police.'"

*Hudson,* —— U.S. at ——, 126 S.Ct. at 2164 (quoting *Segura,* 468 U.S. at 815, 104 S.Ct. 3380).

■ In assessing whether to suppress in-court witness testimony as "fruit of the poisonous tree," we must review the free will or willingness of the witness to testify, the time elapsed between the illegal law enforcement conduct and contact with the witness, the purpose and flagrancy of the law enforcement violation, and whether the costs of excluding the testimony outweigh the benefits of the "deterrent effect." *Ceccolini,* 435 U.S. at 279, 98 S.Ct. 1054; *see Brown,* 422 U.S. at 600–05, 95 S.Ct. 2254; *Akridge,* 346 F.3d at 626. We find most dispositive the degree of free will SPC Carrillo exercised in cooperating with law enforcement, and the temporal attenuation (time lapse) between the unlawful entry and illegal search and seizure by civilian police officers, SPC Carrillo's initial 4 April 2006 questioning by the CID, his 31 July 2006 plea agreement, his 7 August 2006 guilty plea trial, and his scheduled testimony at appellee's 15 August 2006 court-martial.

mate evidentiary objects illegally seized. The fact that the name of a potential witness is disclosed to police is of no evidentiary significance, per se, since the living witness is an individual human personality whose attributes of will, perception, memory and volition interact to determine what testimony he will give. The uniqueness of this human process distin-

*See Ceccolini,* 435 U.S. at 279, 98 S.Ct. 1054; *Akridge,* 346 F.3d at 631–32.

### Free Will

■ The degree of free will SPC Carrillo exercised in agreeing to testify against appellee is significant. Although law enforcement did not have prior knowledge of SPC Carrillo's relationship with appellee, several factors indicate SPC Carrillo made a voluntary choice to testify. *See Stevens,* 612 F.2d at 1229 (finding live-witness testimony, discovered after exploiting illegal wiretaps, sufficiently voluntary and untainted where testimony rendered after defendant consulted with attorney, entered into plea bargain, and gave incriminatory statement "more than a month following his arrest"); *see also Wong Sun,* 371 U.S. at 491, 83 S.Ct. 407 (finding admissible a statement made by person unlawfully arrested, released, and who voluntarily returned several days later to make the statement because "connection between the arrest and the statement had become so attenuated as to dissipate the taint") (internal quotation marks omitted); *United States v. Beasley,* 485 F.2d 60, 63–64 (10th Cir.1973) (finding accessory's live-witness testimony admissible because decision to testify made "three days after the arrest," demonstrates "high degree of probability that she exercised her own volition," and leads to the conclusion "that there was no exploitation of the illegal arrest"), *cert. denied,* 416 U.S. 941, 94 S.Ct. 1946, 40 L.Ed.2d 292 (1974).

Similar to *Akridge,* appellee now asserts SPC Carrillo's decision to testify was not of his own free will because he faced "the Hobson's choice of testifying against [appellee] or being exposed to the maximum amount of confinement for his crimes." Brief for Appellee at 13; *see Akridge,* 346 F.3d at 630. We agree with the *Akridge* court that *Ceccolini* instructs otherwise. Quoting *Ceccolini,* the *Akridge* court stated:

guishes the evidentiary character of a witness from the relative immutability of inanimate evidence.
*Ceccolini,* 435 U.S. at 277, 98 S.Ct. 1054 (quoting *Smith v. United States,* 324 F.2d 879, 881–82 (D.C.Cir.1963) (internal footnotes and quotation marks omitted), *cert. denied,* 377 U.S. 954, 84 S.Ct. 1632, 12 L.Ed.2d 498 (1964)).

Another factor which not only is relevant in determining the usefulness of the exclusionary rule in a particular context, but also seems to us to differentiate the testimony of all live witness—even putative defendants—from the exclusion of the typical documentary evidence, is that such exclusion would perpetually disable a witness from testifying about relevant and material facts, regardless of how unrelated such testimony might be to the purpose of the originally illegal search or the evidence discovered thereby. Rules which disqualify knowledgeable witnesses from testifying at trial are, in the word[s] of Professor McCormick, "serious obstructions to the ascertainment of truth...." C. McCormick, Law of Evidence § 71 (1954).

*Id.* at 630 (quoting *Ceccolini,* 435 U.S. at 277–78 n. 14, 98 S.Ct. 1054). The *Ceccolini* Court, relying on this reasoning, held "admissible at trial [the] testimony of a witness whose identity was disclosed by the defendant's statement given after inadequate *Miranda warnings.*" *Ceccolini,* 435 U.S. at 278, 98 S.Ct. 1054 (citing *Michigan v. Tucker,* 417 U.S. 433, 450–451, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974)). In other words, the appropriate question to ask is, at what point would SPC Carrillo's agreement to waive his rights upon the advice of counsel and to testify truthfully be considered a matter of exercising his free will? If SPC Carrillo approached law enforcement officers six months after appellee's trial, after additional advice from counsel, with more detailed, slightly different information regarding appellee's criminal conduct, would that be considered a result of SPC Carrillo's exercise of free will?

Specialist Carrillo offered to testify against appellee—without a grant of immunity—and made this offer as part his offer to plead guilty entered on 31 July 2006, approximately four months after his 4 April 2006 initial rights waiver and confession to the CID.

Specialist Carrillo pleaded guilty on 7 August 2006, and was scheduled to testify, *without* a grant of immunity, at appellee's 15 August 2006 court-martial. Specialist Carrillo's offer to plead guilty and offer to testify without immunity reflects an "independent act of free will" that breaks the chain of causation between the unlawful entry and SPC Carrillo's subsequent discovery. *Butner,* 15 M.J. at 143 (quoting *Wong Sun,* 371 U.S. at 486, 83 S.Ct. 407); *see United States v. Kaliski,* 37 M.J. 105, 109–10 (C.M.A.1993);[23] *Stevens,* 612 F.2d at 1229. Specialist Carrillo's subsequent trial and specific waiver of the motion to suppress, on 7 August 2006, further indicates his exercise of decisional autonomy. *See also, United States v. Ramos,* 42 F.3d 1160, 1164 (8th Cir.1994) (finding, despite Fourth Amendment violation, defendant's "signing [of a consent-to-search] form was sufficiently an act of free will to purge the taint of the [immediately] preceding illegal detention").

Although SPC Carrillo's decision to testify evolved in part with his offer to plea bargain, "that does not diminish the volition of coming forward." *Stevens,* 612 F.2d at 1229. If SPC Carrillo had been motivated "solely to avoid prosecution, [he] could have waited for a suppression ruling. Instead, [he] entered [his] plea without challenging the admissibility of the evidence against [him]." *Akridge,* 346 F.3d at 631. Accordingly, we find SPC Carrillo's cooperation and agreement to testify at trial resulted from "an exercise of [his] free will, and was the 'product of detached reflection and a desire to be cooperative.'" *Id.* at 630 (quoting *Ceccolini,* 435 U.S. at 277, 98 S.Ct. 1054).

### Time Elapsed

In reviewing time lapses, i.e., "between the time of the illegal search and the initial contact with the witness, on the one hand, and between the latter and the testimony at trial on the other,"[24] as required by the Supreme

23. We find the *Kaliski* case distinguishable. The witness in *Kaliski* was observed engaging in criminal conduct, and therefore, discovered as a *direct and immediate* result of a flagrantly unlawful search. In this case, no one witnessed SPC Carrillo's criminal conduct, and only his name was discovered as the result of Deputy Wallenberg's *independent inquiry* of the hotel manager.

*See Smith,* 324 F.2d at 881 ("The fact that the name of a potential witness is disclosed to police is of no evidentiary significance, per se....").

24. *Ceccolini,* 435 U.S. at 279, 98 S.Ct. 1054; *see also Harris,* 495 U.S. at 23, 110 S.Ct. 1640 (citing *Brown,* 422 U.S. at 603–04, 95 S.Ct. 2254) (Marshall, J., dissenting) (suggesting that courts con-

Court, we also will consider, as the *Akridge* court suggests, whether the witness is a co-accused; the time, place, and manner of the witness' questioning; whether law enforcement officials used the illegally-obtained evidence in questioning the witness; and any intervening circumstances. *See Akridge,* 346 F.3d at 626.

Deputy Wallenberg, a *civilian* police officer, unlawfully entered the hotel room in Grandview Plaza, Kansas, on 3 April 2006 at 2312. On 4 April 2006 at 0913, SPC Carrillo, a co-accused, waived his Article 31, UCMJ, rights and provided *military* investigators a written, sworn confession at 1300 at Fort Riley. Specialist Carrillo offered to plead guilty on 31 July 2006, and, on 7 August 2006, pleaded guilty, knowingly waiving his initial motion to suppress. Ten hours elapsed between the unlawful *civilian* police conduct and when SPC Carrillo waived his rights; fourteen hours after the unlawful conduct he confessed to *military* investigators. Investigator Jurina told SPC Carrillo about appellee's arrest, but as the military judge found, SPC Carrillo was "not informed of all the seized property." Four months elapsed between SPC Carrillo's 4 April 2006 confession and his 31 July 2006 offer to plead guilty in exchange for a negotiated sentence limitation of confinement for twenty-four months and the dismissal of two charges. An additional seven days passed before SPC Carrillo knowingly and voluntarily waived his right to a contested trial, relinquished his motion to suppress evidence, and pleaded guilty at his 7 August 2006 court-martial. Eight days later, SPC Carrillo was scheduled to testify against appellee.

Certain intervening circumstances may occur during the time lapse between the initial contact with the witness and the trial testimony that result in attenuation of the taint from the original law enforcement illegality. For example, courts have found sufficient attenuation, and therefore admissibility, in subsequent confessions provided to different law enforcement agents in different locations. *See Holland v. McGinnis,* 963 F.2d 1044, 1050–51 (7th Cir.1992) (finding admissible second confession given six hours after beating and coerced confession, to *different* police officer in *different* city); *United States v. Daniel,* 932 F.2d 517, 521 (6th Cir.1991) (finding admissible second confession given day after first confession, to *different* police officer at *different* location); *United States v. Manuel,* 706 F.2d 908, 912 (9th Cir.1983) (finding admissible confession given eighteen hours after unlawful, though not flagrantly illegal, arrest). In the present case, intervening circumstances attenuating the taint of illegality include the transfer of investigative information from *civilian* to *military* law enforcement officials, SPC Carrillo's written and negotiated offer to plead guilty, and his waiver and acknowledgement before a military judge of his right to plead not guilty. Overall, we find SPC Carrillo's testimony measurably attenuated from the taint of Deputy Wallenberg's unlawful entry.

### Law Enforcement Conduct

We now address whether the law enforcement conduct (Deputy Wallenberg's unlawful entry into the hotel room) involved an improper purpose or a flagrant violation of the Fourth Amendment. *See Ceccolini,* 435 U.S. at 279–80, 98 S.Ct. 1054; *Brown,* 422 U.S. at 603–05, 95 S.Ct. 2254. We find no support for such a conclusion.[25] As the military judge found, Deputy Wallenberg's purpose for taking two or three steps into the hotel room (when appellee turned and walked back into the room to get his identification) was

sider, in assessing a defendant's statement obtained as fruit of the poisonous tree, the "length of time between the arrest and the [defendant's] statement"). The military judge in the present case only states "the confession was close in time to the unlawful search. There were no intervening circumstances sufficient to cause the taint to be attenuated." The military judge does not mention the time lapse between the initial police contact and the scheduled trial testimony. *See Ceccolini,* 435 U.S. at 279, 98 S.Ct. 1054.

**25.** In their pleadings to this court, appellate defense counsel assert the military judge "considered ... that Deputy Wallenberg's misconduct was flagrant." The defense also argues that, "[b]y [the military judge's] strong, punctuated words" and emphasis, "one can tell that the military judge was particularly disturbed by Deputy Wallenberg's flagrant misconduct." We disagree.

"for his own safety." [26] Furthermore, there is no evidence in the record that Deputy Wallenberg "knew he was committing a [C]onstitutional violation[,] and notwithstanding that knowledge, intentionally entered unlawfully in order to pursue a quest for evidence 'in the hope that something might turn up.'" *Khamsouk*, 57 M.J. at 293 (quoting *Brown*, 422 U.S. at 605, 95 S.Ct. 2254).

In determining whether the initial entry into the hotel room was a purposeful or flagrant law enforcement violation of appellee's Fourth Amendment rights, we must also consider Deputy Wallenberg's "perception of the situation at the time" and his good faith attempt to serve a Geary County, Kansas, district court protective order late at night and upon a potentially violent recipient. *Id.* Our superior court has so aptly pointed out:

> In the real world of law enforcement, officers are often required to make split-second decisions resulting in choices, which, later subject to the frame by frame magnification of appellate review, do not meet Fourth Amendment muster. Nonetheless, decisions taken in good faith, as that term is used in common vernacular, warrant our careful and measured consideration when we assess the purposefulness and flagrancy of police conduct.

*Id.*

Deputy Wallenberg arrived at appellee's hotel room, albeit the wrong room, with the good faith intent to serve a Protection from Abuse Order, and under a mistaken belief that the intended recipient, Phillip Jeffery, was inside. When appellee receded from the open doorway and turned to get his identification, Deputy Wallenberg "took two or three steps into the room." He took these steps to ensure his own safety from threats in areas of the room he could not initially see. Deputy Wallenberg did not enter the room with the intent to find evidence against appellee. In fact, although Deputy Wallenberg initially smelled raw marijuana when outside the door, he specifically did not enter the room because he only thought that "there might have been marijuana in that room at one time." Faced with the possibility of uncovering evidence against appellee, Deputy Wallenberg did not enter based on this reason. Therefore, we do not find Deputy Wallenberg's initial unlawful entry into the hotel room, as part of a concern for officer safety, "misplaced, nor evidence of flagrant conduct." *Id.*

### Cost–Benefit Analysis

As the Supreme Court stated eighty years ago, and reiterated in *Ceccolini:* "'A criminal prosecution is more than a game in which the Government may be checkmated and the game lost merely because its officers have not played according to rule.'" *Ceccolini*, 435 U.S. at 279, 98 S.Ct. 1054 (quoting *McGuire*, 273 U.S. at 99, 47 S.Ct. 259). Rather, "in determining whether invocation of the [exclusionary] rule is warranted, the Court insists that lower courts strike a balance between 'the public interest in determination of truth at trial' and the 'incremental contribution that might [be] made to the protection of Fourth Amendment values....'" *Khamsouk*, 57 M.J. at 292 (quoting *Stone*, 428 U.S. at 488, 96 S.Ct. 3037) (second alteration in original). "Before we penalize police error, therefore, we must consider whether the sanction serves a valid and useful purpose." *Tucker*, 417 U.S. at 446, 94 S.Ct. 2357. As the "attenuated connection test ... mark[s] the point of diminishing returns of the deterrence principle" inherent in the exclusionary rule, we believe the present case reflects that point. WAYNE R. LAFAVE ET AL, PRINCIPALS OF CRIMINAL PROCEDURE: INVESTIGATION 467–68 (2004).

In the present case, a law enforcement officer under the erroneous, although honest,

---

**26.** This is the military judge's only finding of fact regarding why Deputy Wallenberg entered the hotel room. However, we note Deputy Wallenberg's uncontradicted testimony further clarifies that he did not "know if [appellee was] going to get a gun," or if someone was "on the other side of the door with a gun waiting." Deputy Wallenberg stated he "could[ not] see who was on the right side, if anyone was on the right side of the window, or if there was anybody back in the bathroom area." According to his affidavit, Deputy Wallenberg asserted that, once he was inside the room, he saw an "[African–American] female on a chair next to the bed" in the area of his blind spot, and "placed the female ... into handcuffs."

belief that he was at the correct hotel room, conducted an initial, warrantless entry with officer safety as his sole concern. We must assess whether suppressing SPC Carrillo's testimony will deter other officers in doing the same. As the Supreme Court has observed:

> The deterrent purpose of the exclusionary rule necessarily assumes that the police have engaged in willful, or at the very least negligent, conduct which has deprived the defendant of some right. By refusing to admit evidence gained as a result of such conduct, the courts hope to instill in those particular investigating officers, or in their future counterparts, a greater degree of care toward the rights of an accused. Where the official action was pursued in complete good faith, however, the deterrence rationale loses much of its force.

*Tucker*, 417 U.S. at 447, 94 S.Ct. 2357. Judicial suppression of evidence in this case in all likelihood will not result in an increased possibility of such illegal entries. As the Supreme Court noted: "We are unwilling to believe that officers will routinely and purposely violate the law as a matter of course.... [And] if officers enter without exigent circumstances to justify the entry, they expose themselves to potential civil liability under 42 U.S.C. § 1983." *Segura*, 468 U.S. at 812, 104 S.Ct. 3380. Furthermore, it is unlikely that if we suppress SPC Carrillo's trial testimony, such judicial action will deter law enforcement officials from engaging in warrantless entries (taking two or three steps into a room) to better view their surroundings and ensure officer safety. Thus,

we find that "[a]pplication of the exclusionary rule in this situation could not have the slightest deterrent effect on the behavior of an officer such as [Deputy Wallenberg]." *Ceccolini*, 435 U.S. at 280, 98 S.Ct. 1054. The cost on an "evenhanded system of law enforcement" of permanently silencing SPC Carrillo is too great "to secure such a speculative and very likely negligible deterrent effect." *Id.*

## CONCLUSION

By failing to apply the applicable legal standard in assessing admissibility of live-witness testimony, the military judge in the instant case abused his discretion. *See United States v. Youngman*, 48 M.J. 123, 128 (C.A.A.F.1998) (holding that in analyzing the government's use of immunized testimony, "[t]he military judge's use of incorrect legal principles ... constitutes an abuse of discretion"). Based upon our review of the record, we hold the military judge erred in applying the law. Accordingly, the military judge's ruling regarding SPC Carrillo's in-court testimony is vacated. The court-martial of Corporal Ricardo Jones Jr. may proceed in accordance with R.C.M. 908(c)(3).

Judge ZOLPER and Judge WALBURN concur.